Peter T. RIBAUDO, Trustee of Visser Plumbing and Heating Co., Inc., Bankrupt, Appellant,

v.

CITIZENS NATIONAL BANK OF ORLANDO et al., Appellees.

No. 17204.

United States Court of Appeals Fifth Circuit.

Nov. 26, 1958.

---

---

Stephen R. Magyar, Orlando, Fla., for appellant.

C. O. Andrews, Jr., Andrews & Smathers, Orlando, Fla., for appellees.

Before HUTCHESON, Chief Judge, and CAMERON and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The Trustee appeals from an Order of the District Court affirming a series of similar Orders of the Referee arising out of the bankruptcy of Visser Plumbing and Heating Co., Inc., a corporation, engaged in the plumbing contract and supply business. The holdings were that (1) two air conditioning window units and a heating unit were fixtures annexed to the leased realty; and that a Bank, as Creditor of the Bankrupt, (2) was entitled to set off deposits against the Bankrupt's debts to the Bank, (3) was a se-cured Creditor as to inventory pledged under a field warehousing plan, and (4) was entitled to retain collections from accounts receivable assigned as security for loans by the Bank.

### I.

#### Motion to Dismiss Appeal.

Before we get to these questions, we must take notice of the Motion to Dismiss the appeal for untimely filing of the Notice of Appeal.

By its corrected order of December 23, 1957, the District Court denied the Trustee's Petition for Review from the Referee's adverse decisions on all of these points. On December 31, 1957, well within the 30 days' time available for appeal under the controlling provision of the Bankruptcy Act [1] the Trustee filed a petition for rehearing and in the alternative for an amendment of the order as corrected December 23. By order [2] dated January 13, entered January 15, 1958, the District Court denied this petition. Notice of Appeal was filed February 13, 1958. This was within thirty days from the last order but some fifty days after the initial order of December 23, 1957.

The Federal Rules of Civil Procedure are only conditionally applicable. F.R. C.P. 81, 28 U.S.C.A. expressly excludes cases in bankruptcy. But the Supreme Court General Order in Bankruptcy 36, 11 U.S.C.A. following § 53, prescribes that appeals in bankruptcy "shall be regulated, except as otherwise provided in the Act, by the rules governing appeals in civil actions in the courts of the United States, including the Rules of Civil Procedure for the District Courts of the United States."

---

1. "Appeals under this title to the United States court of appeals shall be taken within thirty days after written notice to the aggrieved party of the entry of the judgment, order or decree complained of, proof of which notice shall be filed within five days after service or, if such notice be not served and filed, then within forty days from such entry." 11 U.S.C.A. § 48, sub. a.

2. "This cause coming on this day to be heard upon Petition for rehearing and in the Alternative Amendment of Order filed by the Trustee, and the Court having considered the same and being fully advised in the premises, it is, thereupon—

"Ordered and Adjudged that said Petition be, and the same is hereby denied.

"Done and Ordered in Tampa, Florida, this the 13th day of January 1958.

"William J. Barker,
"Chief Judge,
 U.S. District Court."

Stressing cases involving motions to amend or alter judgments under F.R.C.P. 59, the Trustee insists that this appeal would have been held timely in civil actions and a similar result should follow here. Stevens v. Turner, 7 Cir., 1955, 222 F.2d 352; Segundo v. United States, 9 Cir., 1955, 221 F.2d 296; Papanikolaou v. Atlantic Freighters, Inc., 4 Cir., 1956, 232 F.2d 663; McConville v. United States, 2 Cir., 1952, 197 F.2d 680; Calvin v. Calvin, 1954, 94 U.S.App.D.C. 42, 214 F.2d 226.

■ Whether anything is gained by importing the Federal Civil Rules decisions into this problem is doubtful. While the express provision in F.R.C.P. 59 for motions to alter or amend judgments has no counterpart in the Bankruptcy Act or any express General Order, it is clear that, as between the Court functioning in bankruptcy and in civil proceedings, it has much greater powers to entertain petitions for rehearing in bankruptcy. It may be done even after time for appeal has elapsed. Wayne United Gas Co. v. Owens-Illinois Glass Co., 1937, 300 U.S. 131, 57 S.Ct. 382, 81 L.Ed. 557; Bowman v. Lopereno, 1940, 311 U.S. 262, 61 S.Ct. 201, 85 L.Ed. 177.

Wayne United condenses the troublesome dilemma facing counsel. "A defeated party who applies for a rehearing and does not appeal from the judgment or decree within the time limited for so doing, takes the risk that he may lose his right of appeal, as the application for rehearing, if the court refuse to entertain it, does not extend the time for appeal." 300 U.S. at page 137, 57 S.Ct. at page 385, 81 L.Ed. at page 561. Bowman repeats this caveat but sounds the hope which both of those cases made a reality by their respective orders of reversal: " * * * But where a court allows the filing and, after considering the merits, denies the petition, the judgment of the court as originally entered does not become final until such denial, and the time for appeal runs from the date thereof." 311 U.S. at page 266, 61 S.Ct. at page 203, 85 L.Ed. at page 180.

■■ The key is that the Court must "entertain" the petition, and this seems to be that it must consider it on its merits as a good faith request that the Court take a second look and reverse itself at least in part. If it is so treated, the result is not altered by the fact that the decision on rehearing is the same as the initial order. In that light, there is nothing to suggest that we are not entitled to read Judge Barker's order, note 2, supra, literally that he *heard* the petition for rehearing and *considered* it after being *fully advised.* Certainly with the petition for rehearing filed within ten days of the corrected initial order and twenty clear days left for appeal, he could hardly ascribe to the Trustee's counsel a purpose to use the petition for rehearing as a way to resurrect a right to appeal then gone.

On this interpretation of the District Court's action, MacNeil v. State Realty Company of Boston, Inc., 1 Cir., 1956, 229 F.2d 358, supports our view that the appeal was timely. Carpenter, Babson & Fendler v. Condor Pictures, Inc., 9 Cir., 1939, 108 F.2d 318.

### II.

### The Fixtures.

■■ The Referee denied the request that the Trustee be awarded two window air conditioning units and circulating hot water furnace (not including ducts) installed by the Bankrupt in the leased premises. The two air conditioning units were typical window type. However, to install them the Bankrupt had removed the window frames of the two windows on the mezzanine floor and had replaced them with concrete blocks and glass blocks except for an opening to fit each unit. The Bankrupt had also installed a circulating hot water furnace that included numerous pipes, which, through walls and floors, were connected with radiators permanently affixed to the walls. The heater unit itself was affixed to the floor to which was attached permanent type water and electrical connections.

There is no disagreement over applicable legal principles. 22 Am.Jur., Fixtures, §§ 3–12, 54–62 (1939); Commercial Finance Co. v. Brooksville Hotel Co., 1929, 98 Fla. 410, 123 So. 814, 64 A.L.R. 1219; Ridgefield Investors, Inc., v. Holloway, Fla.1954, 75 So.2d 208. It is finally a question of fact under these principles.

Like the District Court, and for reasons so well stated there, there is no basis to alter the decision. "[T]he record submitted to the Court does not contain the oral testimony upon which the Referee based his Order in reference to the air conditioning units and heating system. The only evidence in this regard being photographs of the air conditioning units and the furnace. Therefore, the Court does not have before it sufficient evidence to reverse the Referee's Order finding that the said units and heating system became part of the leased premises."

### III.

#### The Setoff of Bank Deposits.

On September 10, 1956, the date of bankruptcy, the Bankrupt was indebted to the Citizens National Bank of Orlando on three demand notes aggregating $64,613.30. On that date there was $778.09 on deposit in the Bankrupt's regular checking account and $835.53 in a special payroll account. Between that date and a week later, when all items previously deposited for collection had cleared, the Bank set off this total of $1,613.62 against the loans then due. As security for their payment the promissory notes expressly pledged " * * * also any balance on deposit account of the undersigned with the Bank."

Here again there is no dispute as to the legal principles. Both recognize that a general setoff is permissible in respect of deposits made in the ordinary course of business. 4 Fla.Jur., Banks & Trust Companies, § 83; and see 4 Collier, Bankruptcy § 68.16 (14th ed. 1942). However, both contentions of the Trustee are without merit. The Bank did not lose the right to exercise this option on the filing of the Petition for Bankruptcy. The special payroll account was special in name only. It was not a trust or similar immobilized account. Segregation under that label was for the Bankrupt's convenience only and the funds were subject to its unlimited dominion.

### IV.

#### The Field Warehousing.

Over the period from March 1955 through March 27, 1956, this same Bank, on notes ranging in the neighborhood of $15,000 each, had loaned the Bankrupt an aggregate of $207,462. These loans were secured, the Bank contends, by assignment of construction contracts then in progress and traditional accounts receivable. We discuss these assignments later, infra V. However, more capital was needed and on April 9, 1956, the Bank, the Bankrupt and American Express Field Warehousing Company entered into a contract for the field warehousing of all of the Bankrupt's inventory. On April 11, 1956, the Bank loaned $50,000, then simultaneously deposited to the Bankrupt's general account as new funds, against the security of nonnegotiable warehouse receipts executed by American Express. None of this loan had been repaid and obviously it represented the greater share of the outstanding indebtedness of $64,613.30 referred to above in the discussion of the setoff of bank deposits. The District Court declared that the Bank had a "preferred lien" on the merchandise covered by the warehouse receipts held by the Bank, but it is clear that the term was an inadvertent slip. We look upon it as though the order declared the Bank to have a secured claim.

We see no point in discussing the evidence in detail. It suffices to say that it was the nature of this tripartite arrangement which preoccupied the attention of the Referee, the Trustee personally, and all counsel in the hearings reflected in the 150 printed pages of oral testimony plus many more of written exhibits. From the bank loan officers, the resident vice president of American Express, on down through the bonded warehouse custodian, the Referee saw in flesh and

blood those who knew and stated the actual facts with regard to the genuineness of possession and control of the stock by American Express. He held it valid, and the Trustee does not show where, in reaching this conclusion, the Referee either misperceived the facts or misapplied the law.

Following the typical pattern of field warehousing which is now so well recognized as a desirable and legitimate method of financing, the Bankrupt first subleased its warehouse premises and storage yard to American Express under formal leases which were recorded. Locks on all access doors and gates were changed. The keys were in the sole control of American Express's custodians. Liberally scattered around the premises and on doors and gates were signs in large and readable print showing possession by American Express.[3] This was brought closer home by Reference Stock Cards [4] on numerous stock bins and shelves.

The bonded warehouse custodian and assistants were hired under express written contracts of employment. Their wages were paid, after usual deductions for social security and withholding tax, by checks sent from the New York office of American Express. Under the contract the Bankrupt, of course, reimbursed all expenses, which included these. But these people were still employees of American Express and access to the premises and release of any of the stock to Bankrupt was under their exclusive control. Under the physical arrangement of the building executives and employees of the Bankrupt and business visitors had to pass through the leased warehouse to a balcony on the mezzanine which formed the office. However, this did not interfere with the complete control by the custodian over the goods.

As required by the contract an actual detailed inventory was taken by the custodian in person. The typed list comprising 85,888 units with a value declared by the Bankrupt to be $80,210.62 was affixed to the initial non-negotiable warehouse receipt [5] dated April 11, 1956. On the reverse of a duplicate copy of each such Warehouse Receipt, the Bankrupt, described as the Depositor, warranted the quantity, description and value of the items covered, and declared that " * * * the said merchandise or commodities have been delivered * * * to American Express Field Warehousing Corporation for warehousing purposes * * *. Said receipt is to be delivered to the Citizens National Bank * * * for release of stored goods to be made."

By a contemporaneous written instruction the Bank directed American Express to retain in its custody in the warehouse merchandise worth $133\frac{1}{3}\%$ of the $50,000 loaned. So long as American Express kept merchandise of $66,666.67 on

3. The legend on them was:
   "Warehouse
   of
   American Express
   Field Warehousing Corp.
   All Goods Are In Its Custody"
   or,
   "Notice
   These Premises Leased By
   American Express
   Field Warehousing Corp.
   All Goods Are In Its Custody."

4. These were printed cards about 6" X 3" which stated:
   "Reference Stock Card
   Merchandise or Commodities in the Possession of and Under the Control Of American Express Field Warehousing Corporation
   Warehouse Receipt

Issued To: Citizens National Bank of Orlando
   For Information See
   Warehouse Custodian in Charge of this Warehouse."

5. Each receipt was serially numbered and dated and signed by an authorized custodian. Subject only to certain stated exceptions, none of which are applicable here, the receipt read:
   "This Is To Certify that we have received in Storage Warehouse, 538 West Central Avenue, Orlando, Florida, No. 57 Ex Visser Plumbing & Heating Co. the following described property, subject to all terms and conditions contained herein, For the Account Of and To Be Delivered To Citizens National Bank of Orlando, Orlando, Florida upon the payment of all storage, handling and other charges incurred thereon: * * *."

hand, it was expressly authorized to release merchandise to the Bankrupt on its receipt. As new merchandise was received and stock in excess of the 133⅓% was released to Bankrupt, the custodian kept detailed records. The custodian issued new receipts on behalf of American Express reflecting net gain for the period covered, usually a week. These serially numbered receipts were consolidated in one dated August 20, 1956.

Only in the most trivial respects was there any defect in the possession and control by American Express. There was, first, the passage of people through part of the warehouse area. They could walk, but could not take, and they never did. Next, some miscellaneous items of merchandise, as well as work tools and certain trucks, not actually covered or intended to be covered by a warehouse receipt, were within the posted area and apparently, although not actually, under the control of the custodian. But this did not lessen, it enhanced, apparent exclusive possession. Also, American Express, which had otherwise qualified to do business as a foreign corporation in Florida, had inadvertently failed to procure a local license as to this operation described as "Field Warehouse 57." And the warehouse receipts failed to specify certain technical particulars which would have been required as to a public warehouse under Florida statutes. None of these detracted from the absolute dominion which the contracts clearly invested in American Express and which the parties faithfully respected in actual practice.

The arrangement was a valid field warehousing operation and did not contravene the Florida Bulk Sales Law. Fla. Stat.Ann. § 726.04; Bradley v. St. Louis Terminal Warehouse Co., 8 Cir., 1951, 189 F.2d 818; Barry v. Lawrence Warehouse Co., 9 Cir., 1951, 190 F.2d 433, 438; Bostian v. Park National Bank of Kansas City, 8 Cir., 1955, 226 F.2d 753; Sampsell v. Lawrence Warehouse Co., 9 Cir., 1948, 167 F.2d 885, certiorari denied 335 U.S. 820, 69 S.Ct. 42, 93 L.Ed. 375; 4 Collier,

Bankruptcy § 70.86 at 1454–62 (14th ed. 1942).

Finally, the fact that the Bankrupt's financial statements as of April 30, 1956, delivered to the Bank sometime during May, showed a deficit, cannot satisfy the Trustee's burden of proof that on April 11, the date of the loan and the commencement of the field warehousing pledge, the Bank had reasonable cause to believe the Bankrupt insolvent. Canright v. General Finance Corporation, 7 Cir., 1941, 123 F.2d 98.

## V.

Assignment of Accounts Receivable.

This issue seems to have slipped in through the back door. In the course of the hearing on the Bank's petition to obtain a secured claim on the inventory under the field warehouse receipts, the testimony of the Bank's witnesses disclosed the numerous prior loans aggregating over $200,000 secured, so the Bank said, by assignments of accounts receivable and plumbing contracts in progress. The Bank orally moved for an order allowing it to retain all collections from such accounts. The Trustee, by a similar oral motion, later reduced to formal writing, sought an order compelling the Bank to furnish a detailed list of such assigned accounts, collections made therefrom in the year preceding the bankruptcy, to account for such collections, and an order to remaining account debtors of the Bankrupt to pay the outstanding balance of such accounts to the Trustee. The Referee granted the Bank's request but denied that of the Trustee.

This order, with no accompanying findings of fact, recited in the prefatory part that it appeared to the Court that the Bankrupt " * * * did execute an assignment of receivables under the provisions of Chapter 24297, Laws of Florida, 1947, dated April 5, 1955, and that a renewal of said assignment of receivables dated July 30, 1956, was duly filed with the Secretary of State as provided by said laws of Florida; that copies

of said assignments were attached to the claim of Citizens National Bank of Orlando filed in this cause; that said assignments of receivables were given as security for advances made by Citizens National Bank of Orlando in the usual course of business; that certain sums have been collected thereon, * * *."

Two problems come to us, both directly related to the Florida Accounts Receivable Act, Fla.Stat.Ann. c. 524. One is a factual inquiry whether assignments were actually made as the Act prescribes. The second, and a more important question, concerns the construction of the statute.

On the latter, the Bank's counsel, taking as his golden text the sage advice of the late and pre-eminent advocate John W. Davis that "several guides * * * are to be found in three 'C's'—chronology, candor, and clarity * * * candor, the telling of the worse as well as the best * * *"[6] brings out in the open two things which neither the obscure record nor the Trustee's brief make at all clear. The first is that all such accounts receivable came into existence long after the Notice of Assignment was filed with the Secretary of State. And second, the

situation is identical with that in Republic National Bank of Dallas v. Vial, 5 Cir., 1956, 232 F.2d 785, in which this Court, under a similar Texas statute, held that such subsequent accounts are not protected. The Vial case, to be sure, so decides. But as is so usual, such candor has not been costly. For this was a Texas case in which, subsequent to our earlier decision in Second National Bank of Houston v. Phillips, 5 Cir., 1951, 189 F.2d 115, which dealt with this general matter[7] in Texas, an authoritative Texas decision came down which foreclosed this precise question. Whether rightly or wrongly, Keeran v. Salley, Tex.Civ.App.1951, 244 S.W.2d 663, error ref'd, categorically held that under the definition provisions[8] of the Texas Act the contract between the account debtor and the assignor must be in existence at the time the statutory notice of assignment is filed. The Court stated this in reverse form. "The contract which gave rise to the 'account' here involved was obviously not in contemplation when the notice was executed." 244 S.W.2d at page 666.

Both cases have come in for considerable criticism,[9] and each led to precautionary amendments[10] in almost identical

6. Davis, The Argument of an Appeal, 26 A.B.A.J. 895 (1940).

7. For a discussion of the historical background on non-notification assignment of accounts receivable see M. M. Landy, Inc., v. Nicholas, 5 Cir., 1955, 221 F.2d 923, 53 A.L.R.2d 1385, and Costello v. Bank of America Nat. Trust & Savings Ass'n, 9 Cir., 1957, 246 F.2d 807. As to the Texas Act, art. 260-1, Vernon's Tex.Rev.Stat., see also 25 Tex.L.Rev. 606, 30 Tex.L.Rev. 233, 4 Baylor L. Rev. 392. See also, Koessler, Assignment of Accounts Receivable, 33 Cal.L. Rev. 40 (1945), and, New Legislation Affecting Non-Notification Financing of Accounts Receivable, 44 Mich.L.Rev. 563 (1946).

8. "In this Act, unless the context otherwise requires: (1) 'Account' or 'account receivable' means an existing or future right to the payment of money presently due, or to become due (a) under an existing contract * * *." Art. 260-1, § 1, Vernon's Tex.Rev.Stat.

9. As to Keeran, see 31 Tex.L.Rev. 63. But to Texas Courts this case has lost

none of its vitality, Scarborough v. Victoria Bank & Trust Co., Tex.Civ.App. 1952, 250 S.W.2d 918, 920, error ref'd; Tezel & Cotter v. Roark, Tex.Civ.App. 1957, 301 S.W.2d 179, 180, error ref'd. See also National Surety Corp. v. United States, 1955, 133 F.Supp. 381, 385, 132 Ct.Cl. 724. In United States v. Phillips, 5 Cir., 1952, 198 F.2d 634, we bypassed, as we do here, the question whether Keeran overturned for Texas our decision in Second National Bank of Houston v. Phillips, 5 Cir., 1951, 189 F.2d 115.

As to Vial, see Moore & Kupfer, Accounts Receivable—Current Developments, The Business Lawyer (A.B.A. Section on Corporation Banking and Business Law), reprinted in 75 Banking L.J. 105 (Feb. 1958).

10. The Texas 1955 Amendment and the Florida 1957 Amendment added to the clause "(a) under an existing contract" the following: "or under a future contract entered into during the effective period of the notice of assignment * * *." Tex.Sess.Laws 1955, c. 305, § 1, amending art. 260-1, Vernon's Tex.

language in Texas and Florida as well as in other states.

But the fact remains that Vial speaks only for Texas and for our present inquiry concerning Florida, from whence has yet come no compelling deliverance, Keeran v. Salley is but an aid. Quite naturally, in this process, the differences in the two statutes are of some relevance notwithstanding their more or less common genesis, see note 10, supra, and admitted common aim.

At the outset there is the difference that the Court in Keeran v. Salley pre-

sumably deemed significant by its emphasis with italics (*"presently due,* or to become due *under an existing contract* * * *."* 244 S.W.2d at page 666).

More important, the Florida statute[11] in terms more affirmative and positive than the Texas Act[12] prescribes the nature of a protected assignment and the steps necessary to be taken to secure it.

Four situations are likely to occur: (1) delivery of an assignment of an account receivable followed by filing of the statutory Notice of Assignment; (2) filing of a statutory Notice that assignor

---

Rev.Stat.; Fla.Sess.Laws 1957, c. 57–22, § 1, amending Fla.Stat.Ann. c. 524.01(1)(a).

Its purpose was made doubly sure in Texas by the addition of the italicized portions to article 260–1, § 4: "Such notice of assignment shall be effective for a definite period of time to be stated therein, not to exceed a period of three (3) years, *and such notice shall protect the assignment of accounts which arise during such effective period and which originate out of existing or future contracts, and are assigned by assignor to assignee at any time during such three (3) year period, regardless of whether such account was in the contemplation of the assignor and assignee when such notice was executed."* Art. 260–1, § 4, Vernon's Tex.Rev.Stat. as amended Tex.Sess.Laws 1955, c. 305, § 1.

11. "524.04 Protected assignments

"(1) A written assignment for value, signed by the assignor, becomes protected at the time the assignee: (a) Files a notice of assignment after taking an assignment or (b) Takes an assignment during the effective period of the notice.

"(2) A protected assignee takes subject to: (a) Judicial liens on the account at the time his assignment became protected; (b) An assignment to another person which was protected before his assignment, except that an assignee takes priority over another assignee who files later than he did, regardless of the relative dates of their assignments. Notwithstanding the provisions of subsection (2) (b), a protected assignee takes subject to:

"1. An assignment, prior in time to his, of which he had written notice at the time he took his assignment, and,

"2. Any written contract made by him as to priorities.

"(3) Subject to subsection (2), above, regardless of notice to the debtor a protected assignee has rights to the account and to the proceeds thereof in any form superior to the rights of the assignor and his creditors and assignees from him and may recover the proceeds from any such person in possession of them.

"(4) A protected assignment remains protected while a notice of assignment, a renewal, thereof, or an affidavit of continuance is effective."

The notice is effective for one year and may be successively renewed. § 524.03(1), (2) and (3).

12. "Whenever any person, firm or corporation shall in good faith take a protected assignment of any account or accounts, which shall not have been satisfied, cancelled or released by the assignor, all creditors of, and all subsequent assignees, purchasers and transferees of or from the assignor shall be conclusively deemed to have received notice of such assignment, dating from the time of the filing for record of the notice of assignment hereinabove provided; and after such filing for record, no purchaser from the assignor, no creditor of any kind of the assignor, and no prior or subsequent assignee or transferee of the assignor, holding an assignment not protected, or holding an assignment under a notice of assignment subsequently filed for record, shall in any event have, or be deemed to have acquired, any right in the account or accounts so assigned or in the proceeds thereof, or in any obligation substituted therefor, superior to the rights therein of the assignee named in such prior protected assignment." Art. 260–1, § 6, Vernon's Tex.Rev.Stat.

*intends*[13] to assign accounts followed by subsequent delivery of an assigned account; (3) a simultaneous assignment and filing of Notice; (4) a failure to file statutory Notice or deliver a written assignment.

Situation (1) is covered precisely by § 524.04(1)(a). The same is true of situation (2) under the literal terms of 524.04 (1)(b). As to this the statute plainly states that the assignment " * * * becomes protected at the time the assignee: * * * (b) Takes an assignment during the effective period of the notice." This fits into the pattern of the Act as a whole. Section 524.03 provides that Notice shall be for one year subject to a right of renewal. Subsections (a) and (b) are expressly in the disjunctive. This recognizes the likelihood of these alternative situations and as to each prescribes the time and method of acquiring a protected status.

If the holding of Keeran v. Salley is transposed onto the Florida statute, it effectually destroys subparagraph (1) (b).

The definitive portion regarded as decisive in Keeran v. Salley does not purport to cover the consequence of filing statutory notice, or when or how that is to be accomplished. It dealt only with those characteristics of an "account" or "account receivable" essential to raise a protected status. When viewed in this light, the definition, in both the Texas and Florida statutes, makes a good deal of sense. It gives a cohesion to the Act as a whole and at the same time avoids consequences which are quite out of keeping with the purpose of such Acts to establish a workable and relatively simple mechanism for non-notification financing. As a definition of "account" the meaning was essentially that, at the time of the assignment (without regard to the filing of Notice) there must be a valid and *then* subsisting contract obligating the account debtor then, or in the future, to make a payment of money. Where the act of assignment is the requisite step, the particular account represented must then be in existence as a legally enforceable obligation. It did not mean to prohibit the agreement to assign such accounts when and as they came into being or their actual assignment during the effective period of a statutory Notice.

By weaving Section 524.01(1) (a) and (4) defining assignment[14] into Section 524.04(1) (b), the Act is expanded to read substantially as follows. The assignment becomes protected during the effective period of a prior statutory Notice the moment the assignee takes a written assignment of an account receivable then in existence as a valid and then subsisting contract which obligates the account debtor then or in the future to pay money.

Consequently we determine for Florida that an assignment of an existing account during the effective period of the previously filed Notice affords the protected status.

But Section 524.04, note 11, supra, expressly requires that it be "A written assignment for value, signed by the assignor * * *." On the oral argument much was said pro and con about the mechanics in the handling of these loans and the so-called pledge of the accounts receivable. Much of it took the direction of an analysis of the Benedict v. Ratner, 1925, 268 U.S. 353, 45

13. Section 524.02 prescribes "the following form of notice of assignment, or any other form containing substantially the same information:

"Notice of Assignment of Accounts Receivable

"For Filing with the Secretary of State Date............

.................. has assigned or intends to assign * * * one or more

accounts receivable to................
(Signed)          (Signed)
...................................
Assignor          Assignee
*      *      *      *      * "

14. "(4) 'Assignment' means any transfer of an account, other than by operation of law, including a transfer as security, and the creation by agreement of a lien on an account." Fla.Stat.Ann. § 524.-01(4).

S.Ct. 566, 69 L.Ed. 991, concept. This we regard as immaterial if the facts adequately show that there was a protected assignment under the Florida Accounts Receivable Act. Cf. M. M. Landy, Inc., v. Nicholas, 5 Cir., 1955, 221 F.2d 923. In the confused state of this record, we regard this as one in which the interests of justice require that there be a remand to determine whether there was a written assignment within the meaning of the Act. Fireman's Fund Ins. Co. v. Wilburn Boat Co., 5 Cir., 1958, 259 F.2d 662. If there was, the assignments were protected. If not, then the rights are to be determined under appropriate Florida and Federal principles as though the Act were not in existence. M. M. Landy, Inc., v. Nicholas, supra; Costello v. Bank of America Nat. Trust & Savings Ass'n, 9 Cir., 1957, 246 F.2d 807.

The Orders of the District Court are affirmed as to all matters except "V. Assignment of Accounts Receivable." As to this phase, the order is reversed and the cause is remanded for further and not inconsistent proceedings.

Affirmed in part and reversed and remanded in part.