In the Matter of **ATLAS SEWING CENTERS, INC.,** Debtor.

**UNITED STATES of America,**
Appellant,
v.
**JONES FINANCIAL CORPORATION,**
Appellee.
No. 25525.

United States Court of Appeals,
Fifth Circuit.
Jan. 15, 1971.

Lavinia L. Redd, Asst. U. S. Atty.,
Miami, Fla., Johnnie M. Walters, Asst.
Atty. Gen., Meyer Rothwacks, Atty.,

Dept. of Justice, Tax Div., Washington, D. C., for appellant.

Harold M. Hoffman, New York City, Harry L. Durant, Miami, Fla., Jack M. Gordon, New Orleans, La., for appellee.

J. Charles Burden, Jr., Alexandria, La., Walter H. Beckham, Jr., Miami, Fla., for interested parties.

Before JOHN R. BROWN, Chief Judge, and GOLDBERG and AINSWORTH, Circuit Judges.

JOHN R. BROWN, Chief Judge:

As a last tag end before us in an almost endless proceeding, cf. Bros., Inc. v. W. E. Grace Mfg. Co., 5 Cir., 1965, 351 F.2d 208, cert. denied, 1966, 383 U. S. 936, 86 S.Ct. 1065, 15 L.Ed.2d 852, we deal with the Government's appeal almost four years after the entry of the real orders directing distribution to Jones[1] of the amounts previously set aside to it by the District Court's decrees in the complex Chapter X proceedings of Atlas Sewing Centers, Inc., Debtor. We hold the Government is precluded in its appeal by res judicata, but believing that every seam should be caulked, every sail reefed, every line secured and every anchor set to windward, we reach a like result on the merits or, perhaps more accurately, the lack of merits. The result is that we affirm[2] the District Court's action.

We would at the outset sound the caveat that this opinion is not written that those who run may read. On the contrary it is constructed against our prior decisions,[3] one of which is so detailed that no repetition is needed. All who read—reviewing Court, parties, counsel, scholars and ubiquitous law review case note editors—must simultaneously scan these prior opinions to round out the picture.

Specifically at issue is the correctness of the last order directing the disbursement to Jones of the funds deposited in the Registry in 1964 representing, up to the amount of the deposit, principal, interest and attorneys fees on the indebtedness of Atlas to Jones under the 1961 financing agreement which the Special Master had held, and which we had affirmed to be, a valid secured claim.

The beginning, development and end may be quickly capsulated. Under the December 1961 agreement by which Jones provided extensive financing for handling installment credit sales of sewing machines, each advance under an arrangement satisfying the Florida nonnotification accounts receivable financing structure[4] was secured by pledge of collectible installment sales contracts of an agreed percentage (200 to 286%) of the outstanding advances (Op 2:68). After the commencement of Chapter X proceedings in June 1962, Atlas was in need of additional financing to maintain current operations and as a Debtor seeking reorganization as a continuing concern, (Op 2:68). Jones agreed to supply this but in effect only on the two conditions that the reorganization Court would formally (1) validate the 1961

---

1. Jones Financial Corporation.

2. Although technically this came before us on Jones' motion to dismiss the Government's appeal, we called for and received full briefs on the merits so we dispose of the case on the merits. See Groendyke Transport, Inc. v. Davis and Southern Conference of Teamsters, 5 Cir., 1969, 406 F.2d 1158, cert. denied, 1969, 394 U.S. 1012, 89 S.Ct. 1628, 23 L.Ed.2d 39.

3. Opinion 1:
In the matter of Atlas Sewing Centers, Inc., Debtor, 5 Cir., June 5, 1967, 380

F.2d 41 (covering appeals in Nos. 24157, 20936, 22852, 23891, 24449).
Opinion 2:
In the matter of Atlas Sewing Centers, Inc., Debtor, 5 Cir., June 30, 1967, 384 F.2d 66 (covering appeals in Nos. 24157, 20936, 22852, 23891, 24449, 24495).
For convenience these will be referred to as Op 1 and Op 2 with page citations following the colon; e. g., the reference to the order of October 14, 1966 and appeal No. 24449, 380 F.2d 43 will be cited Op 1:43 and the reference in 384 F.2d 75, 76 will be cited Op 2:75, 76.

4. Ribaudo v. Citizens National Bank, 5 Cir., 1958, 261 F.2d 929.

agreement and (2) approve the new August 1962 agreement covering post-petition advances.[5] This was done by the order of August 20, 1962 (Op 2:68).

By these approved contracts the Debtor (and Trustee) were required to deposit collections from contracts pledged in separate bank accounts for application on the Jones debt exclusively and repossessions were to be handled similarly (Op 2:68). The Trustees' persistent failure and refusal to honor these requirements led to a series of appeals to this Court, the entry by this Court of a number of orders specifically compelling the segregation of the collected proceeds and repossessions for the benefit of Jones, the initiation by this Court of civil and criminal contempt proceedings against the Trustee for violation of our orders, reference by us of the civil contempt proceeding to then Chief Judge, now Circuit Judge, Dyer and the entry of orders by us confirming the findings of violation by the Trustee respecting specifically the 1961 agreement. Op 2:68, 69, 70, 71, 72, 73; Op 1:42, 44. In his initial report Judge Dyer as Special Master held "that the Trustee had violated one of the provisions of [our order of October 11, 1963] in that the Trustee had failed to segregate the proceeds of

sales of collateral under the December 4, 1961 financing agreement" (Op 2:69). "On August 3, [1964] this Court approved Judge Dyer's findings of March 11 * * *" (Op 2:70).

In the meantime much was going on toward formal reorganization of the Debtor. An amended Plan was filed August 4, 1964 (Op 2:70) and by order of September 4, 1964 the District Court confirmed the Plan (Op 2:70). Although the Plan "fails to mention Jones as a secured creditor under the * * * financing agreement of December 4, 1961" (Op 2:70) several things of decisive importance to the present problem were done. It fixed classes of creditors, notably Class 2, giving priority to the United States[6] with secured claims being put in Class 6.[7] Additionally the order confirming the Plan of September 4, 1964 (Op 2:70) made express provision for secured claims,[8] and most important it established the procedure for determination by Special Master, now Judge, Mehrtens on Class 6 secured claims including the Jones 1961 agreement claim.[9]

Rounding out the picture for our purposes, proper notice was given to all parties including the Government,[10] and op-

---

5. This was, in effect, found as a fact by Special Master (now Judge) Mehrtens.

6. Class 2: "The United States with respect to claims for taxes".

7. Class 6: "6. Secured creditors; such creditors of the Debtor holding valid recorded liens on any property of the Debtor, who have been established as such in accordance with an appropriate entry of a Court order establishing the validity and priority of the secured status of the claim."

8. "10. That the Amended Plan provides that all claims included in Class 6, subsequent to the entry of an order of the Court establishing the validity, priority and amount of the respective claims in Class 6, shall be paid the amounts as proven by each claimant to each respective creditor, with interest thereon to the date of consummation of the Amended Plan, or if paid prior to said date of

confirmation then with interest to the date of payment thereof."

9. "28. That William O. Mehrtens, Esquire, be and the same is hereby appointed Special Master to take evidence as to the amount, validity and priority of all claims filed by creditors in Class 6, and report his findings of fact and conclusions of law and recommendations to this Court in accordance with Rule 53 of the Federal Rules of Civil Procedure."

10. The "Notice and Solicitation of Acceptance of Plan to all Parties in Interest" was dated August 4, 1964 and bears the certificate of the trustee that on that date was executed showing mailing "to each of the creditors * * * and parties affected by the * * * Plan of Reorganization as amended * * *, and to * * * Securities and Exchange Commission * * * the Secretary of the Treasury, Washington 25,

tional procedures were established for payment to Jones of the balance due under the post-petition 1962 financing agreement claim (Op 2:70, 71).

When Burden, the Plan proposer, finally paid in the required $1,250,000 in December 1964, the Court on December 31, 1964 entered an "Order in Aid of Consummation of the Plan" (Op 2:71). Estimating the probable amounts due under the December 1961 financing agreement,[11] the Court ordered that approximately $500,000 be deposited in the Registry, of which $92,208.98 was for the 1961 agreement with allowance for estimated attorney fees, etc. The Court directed that this should be disbursed in accordance with the Court's subsequent order [12] and to make this doubly certain the order again provided for the funds to be disbursed in accordance with the finding on validity, amount and priority.[13]

By depositing in the Registry the sum for the December 1961 agreement and by withdrawing approximately $400,000. under the 1962 agreement, Jones surrendered all of the collateral held or claimed, repossessed machines and all funds in segregated accounts [14] (Op 2:71, 72).

Following receipt of Judge Dyer's second report on March 4, 1965 this Court on March 12, 1965 ordered the Trustee to show cause why civil or criminal contempt proceedings should not be entered against the Trustee (and assistant) (Op 2:72). On July 1, 1965 the District Court entered its "Order of Substantial Consummation of the Plan" (Op 2:72).

Shortly thereafter, on October 8, 1965 came the report of Special Master Mehrtens which found that the December 1961 financing agreement was valid, fixed the sum due at $100,766.24 [15] and ordered the payment of all unpaid balances [16] (Op 2:73).

On October 14, 1966 Chief Judge Fulton granted Jones' motion for confirmation of Judge Mehrten's report as Spe-

---

D. C., and all other interested parties as required by the applicable provisions of the Bankruptcy Act pretending to Chapter 10 Proceedings". This certificate has never been challenged. The Order Confirming the Plan (Op 2:70) recites that proper notice under the Act had been given.

11. As to the December 4, 1961 agreement these estimates were:
(i) Principal—$30.085.92
(ii) Interest — 47,123.02
(iii) Est.
Attorney
Fees — 15,000.00

TOTAL $92,208.98*
* The source of the 4 cent discrepancy (now memorialized in hundreds of papers) is now unknown.

12. It is further ordered that the sum of $92,172.20 shall remain in the Registry of the United States District Court " * * * until such time as said Court enters an appropriate order on the validity, amount and priority of said [Jones 1961 Agreement] claim, and said fund shall be disbursed in accordance with said order * * * ".

13. "It is further ordered that this Court shall retain jurisdiction over the sums

deposited within its registry in accordance herewith and shall enter such appropriate orders as it deems necessary to effectuate the release of said sums after it makes a determination that the provisions herein have been complied with governing the release of said sums."

14. This was required by the Order in Aid of Consummation of the Plan.

15. The dollar amounts (for the same items as estimated, see note 11, *supra*) were fixed:
(i) Principal — $30,085.92
(ii) Interest — 50,279.65
(iii) Fees
Expenses — 22,400.67

TOTAL $102.766.24

16. The Master's report expressly reflects that it was "confined to the question of the validity. priority and amount of the" Jones 1961 claim and concluded that the claim "be allowed as a secured claim and that all unpaid balances—be fully paid [in the amounts specified, note 15, *supra*] —." On values the Master found that the "collateral collected and not remitted by the Trustee, and the collateral remaining to be collected are sufficient to pay the total principal, interest, attorney's fees and expenses due Jones."

cial Master (Op 2:75). The Trustee's appeal from this order was thereafter given No. 24449 and was one of the principal subjects of opinion 1 (Op 1:43, 44). Rejecting motions to dismiss the appeal as untimely or for want of an appealable order by "a per curiam opinion dated June 5, 1967, we finally disposed of * * * No. 24449 (Erwin Ray v. Jones)." [17] Op 2:78. It bears emphasis that the Government never appealed the order of October 14, 1966 nor did it seek to enter the appeal in No. 24449 or seek any review of it after the entry of our Opinion 1.

As Opinion 1 reflects so positively, this Court upheld the District Judge's ruling in turn upholding the report of Special Master Mehrtens in all respects, and on the merits we affirmed the validity, priority and amount of the 1961 claim of Jones as a secured claim.

In the plainest of language we first had this to say, that "We reject the contention that the order of October 14, 1966 was not a final order. Nothing save the most mechanical of computations remained to be done." And then having determined to pass upon the merits we went on to say that "On the merits we have no doubt that there was an adequate foundation in fact and law for the conclusions reached by the Special Master and confirmed by the District Court * * *" (Op 1:43).

In assaying the question of res judicata the Government starts off its supplemental memorandum filed in response to the express request of this Court that it "is not questioning in this proceeding the validity, amount or priority of Jones' pre-petition [December 4, 1961 agreement] claim, and it recognizes that the various orders of the District Court bar any creditor, including the Government, from relitigating these matters." But within scarcely two pages this concession is virtually repudiated. Arguing that the adjudication in bankruptcy (discussed post) changes everything the Government makes this enigmatic contention: "thus, an important issue to be determined in the liquidating bankruptcy proceeding is whether Jones' pre-petition claim is to be treated as a secured or as a general and secured claim." [18] Although the Government's position is fuzzy at best, it seems to try to avoid the impact of res judicata by two contentions. The first is that this is somehow independent litigation outside the confines of the Bankruptcy (or reorganization) Court between creditors concerning their relative rights to payment.[19] For this they cite 1B Moore's Federal Practice (2nd Ed.1965) §§ 0.405[1] and 0.405[11], § 0.448, pages

---

17. The Government, presumably relying on our statement (Op 2:80, subpara. G) asserts in its brief that we ourselves have treated No. 24449 as moot. At the time of decision in Opinion 1 (June 5, 1967) it was not moot. It was very much alive but we affirmed it on the merits. Having been affirmed on the merits it was moot concerning Chief Judge Fulton's post-remand hearings and treatment of the question covered in finding G.

18. See also from its original memorandum: "The Government is not questioning Jones' present status as a secured creditor; likewise, it is not questioning Jones' contention that its advances were fully secured on June 22, 1962" (P. 29).
    Again the Government states: "Jones errs in contending that the Government seeks to deprive it of its secured status

or of the security underlying its lien. As we have reiterated, *supra*, the Government is not contending that Jones lost its lien; the Government's contentions are that whatever security they had on June .22, 1962, subsequently was lost because of the trustee's actions, and whatever rights Jones had to the funds, the funds did not become its security for the payment of its pre-petition claim."

19. See Government's supplemental memorandum Page 3: "The general rule is that the allowance of a claim in bankruptcy is a binding adjudication upon all creditors that the claim existed against the estate and was allowed. But it is not res judicata in independent litigation between creditors concerning their relative rights to payment." [Citing Moore] (P. 3)

621–623, 783–787, 4231–4233 and especially at 3075–3076. The second, whether separately or a part of this same thrust, seems to argue that while the existence of a secured claim, namely the validity of the Jones 1961 claim as a secured claim with a lien, is no longer open to question, the problem of payment was not previously determined and therefore it is fair game for anyone or more or all of the thousands of creditors of Atlas to pursue the question and to object to payment, with the likelihood of an equal number of disparate determinations.[20]

We think neither of these contentions has merit. At the outset this is not post-bankruptcy independent litigation between competing creditors over payment. It is an action by the Government—belatedly it turns out—to try to get the reorganization-Bankruptcy Court to make an order different from those previously made and affirmed respecting disbursement of a specified Registry fund. Clearly the Government in these proceedings is one who comes within the term "parties in interest" (See Collier on Bankruptcy Vol. 3 § 57.17, 2.2) Page 254, and as Moore's points out (Page 3074) the adjudication of allowances of a creditor status "is binding upon the parties in interest". Next, and even more important, the orders of the District Court as construed and affirmed by this Court make plain that beginning not later than the December 31, 1964 Order in Aid of Consummation of the Plan the question reserved for determination by the Special Master comprehended the amount, validity and *priority* of the asserted secured claims. We said that in plain terms "the question of the validity and priority of the claim of Jones * * * was reserved * * *" (Op 1:43). And the Master's Report so reflects (see note 16, *supra*). Indeed that order provided that the deposit placed in the Registry should

remain there "until such time as said Court enters an appropriate order on the validity, amount and priority of said claim, and said fund shall be disbursed in accordance with said order" (see note 12, *supra*). The "appropriate order" was entered October 14, 1966 (Op 2:75, 76; Op 1:43) and that order was affirmed by this Court in Opinion 1.

Indeed, this had been prescribed in paragraph 10 of the Order Approving Plan of September 4, 1964 (see note 8, *supra*) prescribing that "subsequent to the entry of an order of the Court establishing validity, priority and amount of respective claims in Class 6 shall be paid the amounts as proven by each claimant * * *". And it was reiterated in paragraph 28 requiring the Special Master to determine "the amount, validity and priority" of all claims in Class 6.

Not only does literal contextual construction of the orders demonstrate that the issue of *priority*—relative right to payment—was determined by an order subsequently affirmed. But on the underlying merits there was a practical necessity for just such orders so that in no sense does Jones acquire a res judicata windfall. For the Plan to have any success at all either in acceptance or operation it had to take care of the Jones 1961 and 1962 claims. This was especially true in the light of the raging controversy including the contempt proceedings arising from the Trustees' handling of the pledged installment contracts and the proceeds and repossessions from them. For the Debtor as a reorganized company to operate it had to get possession of the repossessed machines, get its hands upon the frozen bank accounts of segregated funds, and obtain the actual installment contracts which secured the retail purchasers' debts. It could get these only if Jones surrendered the collateral held under each contract (with repossessions) and released its claims to segregated accounts. This was precisely

20. See, e. g., Supp. Memo "applying these general rules to present proceeding we find * * * that the various orders entered in the Chapter X proceeding did not adjudicate Jones' right to payment and, hence, do not bar the Government from objecting to Jones' petition." (P. 4)

prescribed in the Plan and the subsequent orders. One thing of vital importance was to provide a means for determining judicially the validity of the December 4, 1961 agreement claim as a Class 6 prior claim. This led to the provision for escrowed registry funds so that there could be a judicial determination (which has now been made). Without Jones being afforded alternative options on the post-bankruptcy 1962 claim and a sure means of determining validity and priority on the 1961 claim the Plan would not have been consummated. The orders were essential and they served a business-administrative-legal objective.

■ The Government tries to escape from res judicata by asserting that it had no reason to appeal these orders which established the Registry escrow fund and prescribed the procedures for determining amount, validity and priority of the Jones 1961 claim. It contends that there was no reason to challenge it until the ultimate collapse of Atlas (old or new) which Chief Judge Fulton found to exist in the post-remand hearings in the Spring of 1967 (Op 2:76). But res judicata is not that comfortable. It does not allow parties to await the event and then to determine that a judgment acquiesced in earlier ought to have been challenged. The risk is on one who is bound by the judgment as a party at interest. The Government's silence from 1964 through the 1966 order affirmed by us in Opinion 1 precludes it

from challenging that or the related antecedent orders.[21]

But independent of the res judicata we hold that for the various reasons stated the orders were appropriate and properly construed and were intended to effectuate priority and payment of the escrowed Registry funds upon the determination of amount, validity and priority as was done (and affirmed). And none of the specific contentions now urged by the Government either called for or require a different result.

The first is that under Section 238 of the Bankruptcy Act, 11 U.S.C.A. Section 638,[22] the subsequent adjudication of Atlas as a bankrupt[23] requires that the claim be treated as though there had been an adjudication in June 1962 to thus erase the existence or significance of the orders respecting the 1961 agreement, the Registry deposit, the determination of amount, validity, priority, and the affirmance thereof, and the like.

■ To paraphrase a sometime popular refrain, what the Government ignores are the four little words "so far as possible". The policy of the statute may be assumed to roll the clock back. But the condition which is an integral part of such policy has to reckon with two things. The first is that on occasion the passage of time and the occurrence of events simply make it physically and operationally impossible to recapture the past or to recreate the former status. Second, and of equal if not greater importance, time and circumstance may well have made that which is

---

21. There is of course such a thing as a protective appeal. Jones took a number of them (see Op 2:71).

22. "(a) Upon the entry of an order directing that bankruptcy be proceeded with—
"(1) * * * where the petition was filed under section 528 of this title, the proceeding shall thereafter be conducted *so far as possible*, in the same manner and with like effect as if an involuntary petition for adjudication had been filed at the time when the petition under this chapter was filed, and a decree of adjudication had been entered at the time when the petition

under this chapter was approved; * * *" (Emphasis added). Bankruptcy Act § 238, 11 U.S.C.A. § 638.

23. As contemplated (see Op 2:91, 96) Chief Judge Fulton called subsequent hearings on whether to dismiss the Chapter X proceeding or to adjudicate the debtor or bankrupt. This resulted in his order of adjudication on October 27, 1967 from which no appeal has been taken. The order here appealed by the Government had been entered a week before, while Chapter X was still pending. We do not regard this time lag of much significance.

theoretically possible to be fundamentally inequitable. In either or both of such events it is left for the Bankruptcy Court to exercise its great equitable resources to accommodate these competing factors.

There is no way to roll back the Atlas clock, nor to put Jones in a position even faintly comparable to that of the various critical times subsequent to June 22, 1962, the date of filing. The first is August 20, 1962, the date of the order effectually validating the 1961 agreement and affording continued financing during the reorganization operation. Here the 1961 and 1962 agreements were interdependent and 1962 with its large advances would never have occurred had 1961 not been at least tentatively validated. The next date would be acceptance by Jones of the amended Plan leading to the Order of Confirmation of September 1964. What was implicit in treatment of Class 6 secured claims became explicit by the December 1964 Order in Aid of Consummation. Again, while 1961 and 1962 were handled separately, Jones then had to reckon with both the 1961 and 1962 agreements. Under the proposed disbursement of funds deposited by Burden (approximately $1 million) Jones had to give up all pledged collateral and repossessed machines under both agreements, 1961 and 1962. Since this Court, in the contempt proceedings and the orders leading to them, had itself directed segregation of the collections and retention of repossessed machines, thereby affirming, in effect, that Jones had exclusive right to the security of the installment contracts, it is inconceivable that Jones —armed with these protective orders and the reports of Judge Dyer as Special Master—would have surrendered the security both in hand and that as to which it had a strong prospect of recoupment, for nothing more than an empty promise that a fund would somehow, sometime be established in which Jones might someday, somehow seek to show that it was entitled somehow to participate as prior claimant in its distribution. The package called for a deposit, express provision for the judicial establishment of the status of the claim as a preferred prior one, on the one hand, and contemporaneous surrender by Jones of the contracts, repossessed machines and the segregated balances on the other.

At this late date with nothing but "a corporate corpse, which has long since been beyond any possibility of any resuscitation" (Op 2:91) there is no possible way of restoring to Jones either the September-December 1964 position, the security it then held and relinquished or the economic forces which, on the eve of launching a hopeful reorganized enterprise, it might have generated as a condition to full and faithful honoring of the August 1962 order which affirmed validity of the 1961 agreement as a condition to essential continued financing. Under these circumstances the equitable principles—always a guiding factor in bankruptcy matters—expounded in Hanssen v. Wingren, 10 Cir., 1941, 121 F.2d 1011, cert. denied, 1941, 314 U.S. 683, 62 S.Ct. 186, 86 L.Ed. 546, a case often and recently cited [24] could not possibly tolerate what the Government [25] here seeks.

24. See Collier on Bankruptcy, Vol. 6A, Section 120, page 793(4) citing: In re Technical Marine Maintenance Co., Inc., 3 Cir., 1948, 169 F.2d 548; Claybrook Drilling Co. v. Divanco, Inc., 10 Cir., 1964, 336 F.2d 697.

25. The following cases so heavily pressed by the Government neither permit nor require a different result here: Valdes v. Feliciano, 1 Cir., 1959, 267 F.2d 91; In re Knight Realty Corp., 3 Cir., 1967, 370 F.2d 624, cert. granted, sub nom., Reading Co. v. Brown, 1967, 389 U.S. 895, 88 S.Ct. 212, 19 L.Ed.2d 213; NLRB v. Killoren, 8 Cir., 1941, 122 F.2d 609, cert. denied, 1941, 314 U.S. 696, 62 S.Ct. 412, 86 L.Ed. 556. In re Wil-Low Cafeterias, Inc., 2 Cir., 1940, 111 F.2d 83; In re Columbia Ribbon Co., 3 Cir., 1941, 117 F.2d 999.

■ Only brief mention need be made of its last contention that under § 199 of the Bankruptcy Act, 11 U.S.C.A. § 599, payment cannot be made without infringing upon the Government's priority on tax claims.[26] The quick answer to this is that, first, the Plan provided specifically for priority in payment to the Government (see note 6, *supra*). Second, it remains an unchallenged fact that the Secretary of the Treasury received appropriate notice of the Plan and registered no objection. The Plan and the orders giving life to it have to be read together. The Plan provided that secured creditors would be paid on establishing amount, validity and priority of the respective claims. The order Confirming the Plan expressly appointed a Master for determination of those issues and the Order in Aid of Consummation (December 31, 1964) provided that the Court should enter "an appropriate order on the validity, amount and priority of said claim, and said funds shall be disbursed in accordance with said order." This structure, to which the Secretary of the Treasury made no objection and from which the Government sought no review until the order before us, reflects a structure within the adjustments which § 199 permits. In the special circumstances of this case § 199 has not been infringed.

We end what will someday be Op :3 by what we held in Op 1:43—the order here under review was a ministerial direction to the Clerk to pay out Registry funds after "the most mechanical of computations" had been made pursuant to our mandate affirming the order of October 14, 1966.

Affirmed.

**26.** "If, in any proceeding under this chapter the United States is a secured or unsecured creditor on claims for taxes * * *, no plan which does not provide for the payment thereof shall be confirmed by the Judge except upon the acceptance of a lesser amount by the Secretary of the Treasury certified to the court: *Provided*, That if the Secretary of the Treasury shall fail to accept or reject a plan for more than ninety days after receipt of written notice so to do from the court to which the plan has been proposed, accompanied by a certified copy of the plan, his consent shall be conclusively presumed."