Samuel KAUFMAN, As Trustee in Bankruptcy of A–OK Motor Lines, Inc., Plaintiff-Appellee,

v.

The FIRST NATIONAL BANK OF OPP, ALABAMA, Defendant-Appellant.

No. 73–1857.

United States Court of Appeals, Fifth Circuit.

May 10, 1974.

Rehearing Denied Aug. 8, 1974.

Frank J. Mizell, Jr., Montgomery, Ala., for defendant-appellant.

Samuel Kaufman, L. Wayne Collier, Montgomery, Ala., for plaintiff-appellee.

Before GODBOLD, SIMPSON and INGRAHAM, Circuit Judges.

GODBOLD, Circuit Judge:

Within four months of the bankruptcy of A–OK Motor Lines, Inc., the Bank, in order to reduce a debt due it by A–OK, set off against the debt funds on deposit in two A–OK accounts, known respectively as the "A–OK COD account" and the "A–OK escrow account."[1] The bank claims the benefit of § 68 of the Bankruptcy Act, 11 U.S.C. § 108, which in certain circumstances permits setoff of mutual debts between the estate of a bankrupt and a creditor.

The crux of the controversy is whether the COD and escrow accounts were of such character that the bank was entitled to make the setoff. The District Court found deposits in the accounts were trust funds not subject to setoff. We affirm, but remand for consideration by the District Court of a limited issue discussed *infra*.

In a nonbankruptcy context, the right of a bank to a lien against money deposited with it and the right to set off a deposit against the depositor's indebtedness to the bank are part of the law merchant. 5A Michie, Banks & Banking, § 114 p. 300. The courts have had considerable difficulty in this area with both concepts and terminology. The right to make a setoff requires determining the character of the deposit and the bank's knowledge or notice of its character. The legal status of the depositor—individual, trustee, public officer, etc.—may be relevant as evidence of the character of the deposit or notice to the bank or both. Necessarily, concepts from the law of trusts may be applicable. The banking law of general versus special deposits is to be considered as well. The right of the bank to mingle with its assets general deposits but not special deposits may be fed into the analysis. The application of these several legal concepts, and the special jargon of each, has produced a body of law not entirely consistent and certainly without the corners neatly fitting together.[2]

1. The Bank, with knowledge of A–OK's insolvency, transferred to A–OK's general bank account (called the "A–OK regular account") balances totalling $46,197.34 in the COD and escrow accounts. At the date of transfer the general account was overdrawn by more than $153,000.

2. Some of the difficulty comes from the fact that a particular concept may be in one instance a causative factor requiring a conclusion that setoff is not available (as where funds are the subject of a preexisting and known trust), while in another instance it may be a mere description of the status of

■ The right of the bank exists only where with respect to both debt and deposit the bank and the depositor are in debtor-creditor relationship, and there must be mutuality of demands. *Id.* § 115c, p. 309. The debts must be between the same parties and in the same "right" or capacity, so that, for example, the bank (having notice of the character of the deposit) cannot set off against a depositor's individual debt a deposit made by him in his capacity as a public officer or as executor or administrator. *Id.* at p. 310.

■ From the trust law approach, it is clear that the right to set off does not extend to funds held in trust by the depositor and (with notice to the bank of their character) received on deposit. In re Goodson Steel Corp., 488 F.2d 776 (CA5, 1974) (bankruptcy case); Restatement of Trusts, Second § 324i.[3]

■ From the special deposit approach, stated broadly, funds deposited for a special purpose known to the bank, or under special agreement, cannot be set off by the bank. 5A Michie, Banks & Banking, § 129, p. 352.[4] A deposit is special rather than general when there is specific direction, or agreement express or implied, that it be special or where there are circumstances sufficient to create a trust by operation of law. 5B Michie, Banks & Banking, § 328, pp. 263, 266–267. The consequence of a deposit's being special in the sense that it cannot be subject to setoff is at

times described in trust terms. "[W]here the deposit is made for a special purpose, known to the bank—as, for example, to be paid to creditors—the money is held as a trust fund and hence the bank is without lawful right to appropriate the deposit to its own use as a set-off." 4 Collier, Bankruptcy, § 68.16, pp. 925–26.[5]

■■ However, if a trustee deposits trust funds in his name as such, the deposit is general and a debtor-creditor relationship is created. The bank does not become a trustee of the funds, and it may mingle the funds with its general assets. V Scott, Trusts § 527, p. 3671. The bank is not bound to supervise the use or application which the fiduciary depositor makes of the trust funds, and, therefore, it is not liable for misapplication merely because the funds are identified as trust monies. This must be distinguished from the situation in which the bank, with notice that a deposit is of trust funds, seeks to set them off against individual indebtedness of the depositor to it. The bank, with an interest in the transaction, is then seeking to profit from a misapplication of trust funds, which it will not be permitted to do. IV Scott, Trusts (3d ed.) § 324.3–4, pp. 2525–33; V *id.* § 527, p. 3674.

Thus it is seen that the general-special deposit approach does not quite fit with the trust approach, and neither of these approaches fits with the analysis that focuses on whether funds are subject to mingling.[6] As pointed out above,

---

the funds *after* it has been determined under other legal principles that setoff is unavailable.

3. If the bank is a creditor of the depositor individually, as in the case where he is liable on a note held by the bank or where he has overdrawn his individual account with the bank, it cannot set off against the indebtedness a deposit standing in his name as trustee or otherwise in such form as to indicate the fiduciary character of the deposit. In such a case the bank clearly has notice of the existence of a trust and that it has no right to make the setoff.
IV Scott, Trusts (3d ed.) § 324.4, p. 2533–34 (footnotes omitted).

4. In Alabama it is said that a special-purpose deposit creates no debtor-creditor relationship and the bank acquires no title to the funds. First National Bank v. Prickett, 19 Ala.App. 204, 95 So. 920 (1923).

5. In this and the preceding authority, and in the cases they cite, the term "trust" is used as a label rather than as a causative factor. See note 2 *supra*.

6. Does a depositor actually ever think in terms of whether under internal bookkeeping procedures the bank will segregate or mingle the funds? More likely his concern is that the money will be devoted to its special purpose or that its character as trust assets will be protected, and how the bank keeps its books or sets up its balance sheet is of

a deposit of trust funds may be "general" yet setoff may be barred by lack of "mutuality of debts."[7]

■ We turn to the facts concerning the two accounts in question. There is little dispute concerning the nature of the COD account. In January 1970 a hearing was held before the Alabama Public Service Commission (APSC) in response to complaints that A–OK was not properly handling funds that had been collected from consignees of COD shipments and were the property of consignors.[8] Both Bank and carrier were represented by counsel at the hearing. The Bank was then pledgee of all of A–OK's stock. Following the hearing the APSC entered an order pointing out that pending the closing of a prospective sale of the company, the Bank was supervising its operations, and that respective counsel for the Bank and A–OK had represented to the Commission that COD consignees were remitting by checks payable directly to the shippers and that funds collected for COD shipments would not be deposited in A–OK's bank account. The Commission then ordered that the case be continued,

> with the understanding that operations . . . will be supervised until further notice to this Commission by the First National Bank of Opp, Alabama, and upon the assurance that *no Collect-On-Delivery monies are now being deposited to the general bank ac-*

*count of Respondent* . . . . (emphasis added)

The next day, January 20, 1970, the COD account was opened, and under the Bank's own supervision COD collections, and only COD collections, were deposited therein until February 9, 1970. It is obvious that this arrangement was a means of setting aside COD funds that were collected by A–OK rather than remitted directly to the consignors by consignees, and of assuring compliance with the Commission's understanding that such collections were not placed in A–OK's general bank account.[9]

On February 9 the Bank notified the APSC that it had sold all the stock of A–OK, that the purchasers had taken over control and management, that as of that date A–OK was depositing COD funds in an account for payment to the proper parties, and that the Bank would no longer exercise supervisory control. After February 9 some of the COD collections, but not all, were deposited in the COD account.[10]

In May an SBA-guaranteed loan, discussed below, was closed and $35,000 of the proceeds deposited in the COD account. This amount represented the best guess of the company, after examination of the records, of the total claimed by COD shippers. With respect to funds on deposit in this account the Bank mounts a two-pronged argument: that their setoff was proper at all times,

no moment to him. In Stonebraker v. First National Bank, 76 F.2d 389 (CA5, 1935), this court declined to give priority to a depositor (of a bank that became insolvent in 1932) where the deposit had been received pursuant to a special agreement, on the ground that the bank, in violation of the agreement it had made, had failed to segregate the funds. Perhaps the case can be explained on the ground of judicial reluctance to give preferred status to one depositor over other and general depositors, in the wake of the bank failures of the Great Depression. Or perhaps it is an inexplicable anachronism.

7. Note also that a deposit which is special by Collier's definition of a deposit for a special purpose, such as to be paid to creditors,

cannot be set off, while Professor Scott dwells at length on the fact that, at least for purposes of priority on insolvency of the bank, a general deposit for a special purpose creates only a debtor-creditor relationship. V Scott, Trusts, § 530, p. 3680 et seq.

8. Concurrently the Interstate Commerce Commission was investigating the same or similar complaints.

9. Also there was testimony that what was required by the APSC was requested by the ICC and that A–OK "tacitly agreed" with ICC.

10. The trustee makes no claim that the Bank is in any wise responsible for A–OK's deposits of COD funds in other accounts.

and, alternatively, if their setoff was ever improper, it became proper again on February 9 when the Bank gave notice to APSC that it would no longer supervise A–OK's operations.

We agree with the District Court that funds from this account could not be set off. COD collections were collected by A–OK on behalf of its shipper-customers. The custom and practice in the business is that they be segregated from general funds of the collecting carrier. The Bank arranged to set aside COD collections not for its benefit but for the protection of the class of persons whose complaints had jeopardized A–OK's capacity to continue to operate. The Bank operated under that arrangement while it was supervisor and notified the APSC of the viability of the arrangement when it stopped supervising. The Bank could not later appropriate COD funds to its benefit in derogation of the rights of those whom the account was set up to protect.[11]

The Bank's alternative theory that the status changed on February 9 misconceives the function of the bank as depository. The unusual service performed by the Bank as a temporary supervisor of the business operations of an ailing creditor heavily indebted to it neither annuls nor limits its responsibilities as a banking institution, placed upon it by operation of law. Once the Bank had knowledge of the nature of the account, and of the funds being deposited therein, it could not shuck off its responsibilities (and give itself access to the funds) by, in its phrase, "disavow[ing] ownership and supervision [of A–OK]." [12]

■ The status of the escrow account is in somewhat more dispute. But the issue is factual. In May 1970 A–OK closed a $350,000 loan made by the Bank and 90% guaranteed by the Small Business Administration. From the proceeds $150,000 was used to pay off an existing loan from the Bank (also referred to as an SBA loan). From the remaining $200,000 some $95,000 was deposited in the newly created escrow account. These were the only funds ever deposited in it. All agree that $35,000 of the amount deposited was set aside to be paid to the Internal Revenue Service and for no other purpose and subsequently was disbursed for that purpose. There was testimony that one of the stipulations of the SBA's commitment to guarantee 90% of the loan was that a special escrow account be set up to take care of determined debts, such as the one to Internal Revenue, and certain other debts that could not be determined, chiefly to interline carriers. It was explained in testimony that approximately three-fourths of A–OK's business came from other carriers and that the majority of them had ceased doing business with A–OK. The president of A–OK testified that once the escrow account was established he was able, using it as a basis, to persuade many carriers to resume doing business with A–OK. Funds could be disbursed from the account only upon the joint signatures of an officer of A–OK and an officer of the Bank. President Cole of A–OK understood that the Bank had to approve every disbursement, and he testified that to his knowledge the escrow account was never used for any purpose other than those for which it was established under the requirements of the SBA.

There was testimony that the escrow account was a mere convenience to A–OK and not required by SBA as a condi-

---

11. The Bank argues that it agreed with A–OK to permit money to be transferred from the COD account to the general account. This contention founders on the factual findings, amply supported, that there was no such agreement, and on the conclusion of law that even if there were it could not deprive the deposits of their trust character.

12. As noted above, when the Bank told the APSC that it was terminating supervision it included a statement that COD collections were then being placed in an account for payment to the proper parties. There was testimony from the new operators of the company that at least twice the APSC sent examiners to A–OK to see if its January order was being complied with.

tion of its loan guaranty, but the choice between the differing versions was for the District Judge as fact finder.[13] Regarding the present facts "with an interested eye" to the law of the state in which the case arose, see In re A. M. Townson & Co., 283 F.2d 449, 452 (CA3, 1960),[14] we perceive adequate evidence to support the conclusion that these funds were not subject to setoff. In the Alabama case of First National Bank v. Prickett, *supra*, the bank made a loan to its customer who placed it on deposit under an agreement with the bank president that it would be used for the special purpose of paying a check made by the customer to Slaughter, from whom the customer was buying certain equipment. Without the president's knowledge, the bank honored a check the customer previously had given to a third party (the president having told the third party that he would attempt to collect it for him), and deposited the proceeds to the third party's account. On learning what had occurred, the president directed that the deposit to the third party's account be cancelled and Slaughter's check honored. The third party sued and won a judgment. The Alabama Court of Appeals, reversed, holding that the deposit for a specific purpose was special and remained the property of the depositor or of the beneficiary, Slaughter, until the terms of the deposit had been complied with, and that no part of the funds could be diverted or applied by the bank for a different use or purpose. If the bank cannot divert special deposit funds to another, it is obvious that it cannot divert them for its own financial benefit. See also Central National Bank v. Connecticut Mutual Life Ins. Co., 104 U.S. 54, 26 L.Ed. 693 (1881).

■ The District Court correctly held that the Trustee had standing to bring this plenary action. The Trustee represents creditors of the estate and is empowered to avoid transfers voidable under federal or state law by a creditor holding a provable claim. 4A Collier, Bankruptcy, § 70.90. Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), concerned the effort of a Chapter X trustee to pursue on behalf of debenture holders a claim against an indenture trustee for the company in reorganization for failure of the indenture trustee to perform its obligations under the indenture. It is not authority that the trustee in this case lacks power under § 70 to pursue on behalf of creditors the two bank accounts set off within four months of bankruptcy.

■ We must also reject the argument that there was no unlawful preference because the funds transferred to the general account of A–OK were "available" to the company until it went out of business. The transfers instantly reduced A–OK's indebtedness to the Bank in the form of overdrafts by the total of the transfers. The fact that the Bank permitted the general account to continue in use,[15] accepting other deposits therein and honoring checks drawn thereon, cannot change the fact that at the moment of transfer the Bank bettered its general account position by the amount of the transfers and at the expense of those for whom the funds were held in trust.

■ The District Court did not err in granting interest to the Trustee.

---

13. Compare Ribaudo v. Citizens National Bank, 261 F.2d 929 (CA5, 1958) in which we wrote:
   The special payroll account was special in name only. It was not a trust [account] *or similar immobilized account.* Segregation under [the "special payroll account"] label was for the Bankrupt's convenience only . . . .
   *Id.* at 933 (emphasis added).

14. Since the present case arises under the Bankruptcy Act, federal law is applicable. We regard state law as a useful tool but not binding on us.

15. The account was overdrawn from January until the SBA loan was closed. The overdraft status ended but only for a couple of months, and by the time the transfers were made overdrafts were $153,000 plus.

One issue requires further consideration by the District Court. There is some evidence tending to show that after September 11 a number of COD claims were paid out of the general account into which the COD account balance had been transferred. While we intimate no view on the merits, the Bank points out that if it is required to turn over the amount that was in the COD account on the basis that it was held in trust for a certain class of creditors, then it is entitled to consideration of a credit against that amount to the extent that the trust funds thus improperly transferred into the general account, or other funds subsequently advanced by the Bank to the general account, were used to pay members of the class of beneficiaries of the trust. See also 11 U.S.C. § 96(a)(8), (c). The District Court is the proper forum for exploration of this problem.

Affirmed in part and remanded for further proceedings not inconsistent with this opinion. Costs are taxed against the Bank.