UNITED STATES of America ex rel.
CROW CREEK SIOUX TRIBE

v.

TRI-COUNTY BANK OF CHAMBER-
LAIN, SOUTH DAKOTA, a
corporation.

No. CIV 73-3019.

United States District Court,
D. South Dakota.

July 7, 1976.

860

David L. Bergren, Fort Pierre, S. D., for plaintiff.

Robert E. Morgan, Chamberlain, S. D., for defendant.

## MEMORANDUM OPINION

BOGUE, District Judge.

Between 1971 and early 1973, Defendant Tri-County Bank of Chamberlain, South Dakota, made some sixteen loans to Plaintiff Crow Creek Sioux Tribe. Crow Creek Sioux Tribe apparently did most of its banking at Tri-County Bank during this period, as evidenced by the existence of several checking accounts held in the name of various tribal programs and businesses.

In return for each of the sixteen loans, a promissory note was executed by the Chairman of the Tribe. The individual notes will be discussed in detail below, but it may be noted at this point that only five of the sixteen notes were expressly authorized by the Crow Creek Sioux Tribal Council (although one of the other eleven notes was merely a renewal of an outstanding note which had been authorized by resolution, and another note was for the stated purpose of advancing an installment on an outstanding note which had also been authorized by resolution. Thus seven of the sixteen notes bear at least colorable tribal approval). There is no evidence to indicate that any of the loan agreements had been approved by the Secretary of the Department of the Interior. *cf.* 25 U.S.C. § 81.

The sixteen notes in question were either made for expressly stated purposes or secured by specific collateral. Each of the notes bore, *inter alia,* the following terms:

> This note is payable at a definite time subject to any acceleration . . .
> Upon any default in the payment of interest, this note shall become immediately due and payable at the option of the holder hereof.

Using the purpose or collateral as titles for the respective notes, the notes are as follows (each title is followed by the number, in parentheses, which the bank assigned to the notes—the list includes the Tribal checking account wherein the loans in question were deposited, in instances where evidence was offered of such a deposit):

1. *Case loader note* ( # 9592). This $10,-600.00 note was authorized by Tribal Council Resolution CC–72–3–17, which further authorized that the installment payments for the note were to be made from the Tribe's construction company funds.

2. *Case loader payment note* ( # 11042). This note was an advance made for the

purpose of paying one of the installments on the case loader note (# 9592). $4,771.04 was advanced in return for the note.

3. *Backhoe and front-end loader note* (# 8738). Authority for the then Chairman's execution of this $11,750.00 note is found in Tribal Council Resolution CC–8–31–72.

4. *Backhoe payment note* (# 11041). The evidence does not clearly indicate whether the $5,135.64 loan evidenced by this note was for the purpose of advancing an installment on the backhoe and front-end loader note (# 8738).

5. *Water treatment plant note* (# 12051). The loan underlying this note was characterized as an advance pending receipt of funds for the tribe's water treatment plant. The amount loaned, $8,000.00, was deposited in a checking account the Tribe maintained for its water treatment program. No council resolution authorized the note.

6. *EDA Project note* (# 10601). An advance of $31,000.00 was made by the bank pending the Tribe's receipt of EDA funds in return for the then Chairman's execution, without benefit of Council resolution approving this note. The loan was deposited in the Tribe's checking account for water storage facilities.

7. *Planning Grant note* (# 12175). The $4,000.00 loan received in return for this note was deposited in the Tribe's "Planning Project" checking account. No Council resolution authorized the then Chairman's execution of this note.

8. *Council Resolution note* (# 7947). As indicated by its otherwise vaguely stated purpose, this $3,127.73 note was authorized by Council Resolution CC–71–1–5. The liability underlying this note was discharged by the subsequent execution of a renewal note listed immediately below.

9. *Council Resolution Renewal note* (# 10610). This note was simply a renewal of the above note's face amount with interest, and is a promise to pay a renewed face amount of $3,572.48.

10. *Dacotah Standard note* (# 12052). The Tribe maintained a checking account for the operation of an enterprise known as Dacotah Standard, and this $5,500.00 loan was deposited in the Dacotah Standard account. No Council resolution authorizes this note.

11. *Insurance premium note* (# 11036). $11,503.80 was loaned by the bank in return for this note. The loan was obtained for the general purpose of covering insurance premiums. The testimony of Mr. Henry Schelle, President of defendant bank, indicates that the purpose of this loan was related to the development of a commercial complex operated by the Tribe. While no council resolution authorized this note, Mr. Schelle testified that he relied on the articles of incorporation used to form the Commercial Complex organizational structure in making this loan. The Articles of Incorporation for the Complex were not offered into evidence at the trial of this case, and thus the Court is unable to make a finding on the question of whether this loan had received tribal authorization.

12. *Motel note* (# 12050). An advance of $7,500.00 pending the Tribe's receipt of funds for its then proposed motel was made in return for this note. The advance was deposited in a tribal checking account entitled "Recreation and Commercial Complex." No council resolution to support the loan was offered into evidence.

13. *The earnest money note* (# 9858). This note evidences a $3,000.00 loan made so that the Tribe could put down earnest money on a mines land contract it was apparently negotiating at the time. This loan lacks the authorization which would be provided by a council resolution.

14. *Tractor note* (# 8036). Council Resolution CC–71–2–13 authorized a loan for "refinancing of a new . . . tractor," and the then Tribal Chairman obtained a $4,850.00 loan, evidenced by this note, pursuant to that resolution.

15. *First Court Fund note* (# 10611). A $6,000.00 advance pending the Tribe's receipt of funds for its court fund. Its execu-

tion was authorized by Council resolution CC–73–11–18.

16. *Second Court Fund note* (# 12049). This was another advance of $8,000.00, which was deposited in a checking account maintained by the Tribe for its court fund. The advance was made pending receipt of moneys for the Tribe's court fund. The then Chairman's execution of this note is not supported by a council resolution.

Since the liability underlying the note listed as number eight above was discharged by the execution of the note listed as number nine, the remainder of this opinion will deal primarily with only the remaining fifteen notes.

During the period in question (1971–1973), the Tribe also maintained numerous checking accounts at the defendant bank, twenty-eight of which are relevant to this action. Each of the Tribe's various business and governmental undertakings was at least in part accounted for in the Tribe's records by the maintenance of a separate checking account for the particular undertaking involved. All but one of the checking accounts involved in this action were opened by signing a signature card which bore the title of the account and the account number, and which also contained the following terms:

Items received for deposit or collection are accepted on the following terms and conditions. This bank acts only as depositor's collecting agent and assumes no responsibility beyond its exercise of due care. All items are credited subject to final payment and to receipt of proceeds of final payment in cash or solvent credits by this Bank at his own office. This Bank may forward items to correspondents and shall not be liable for default or negligence of correspondents selected with due care nor for losses in transit, and each correspondent shall not be liable except for its own negligence. Items and their proceeds may be handled by any Federal Reserve Bank in accordance with applicable Federal Reserve rules, and by this bank or any correspondent in accordance with any common bank usage, with

any practice or procedure that a Federal Reserve bank may use or permit another bank to use, or with any other lawful means. The Bank may charge back, at any time prior to midnight on its business day next following the day of receipt, any item drawn on this Bank which is ascertained to be drawn against insufficient funds or otherwise not good or payable. An item received after this Bank's regular afternoon closing hour shall be deemed received the next business day.

I hearby agree to the by-laws, rules and regulations of the above-mentioned bank, governing deposits made in its checking department now and/or hereafter adopted by said bank. It is agreed that all stop payment orders be made in writing in accordance with the rules of the bank. The bank is authorized to charge this account a service charge in accordance with its rules. The bank is authorized to mail by ordinary mail the statement and cancelled checks to address last known to bank.

The only account which was opened with a different signature-card agreement was the Crow Creek Tribal Construction Company account, which was a joint account with terms and conditions reflecting the rights and liabilities involved in a joint account. The evidence adduced at the trial of this action does not include any reference to the terms of any agreement regarding the Tribe's numerous checking accounts other than the ones contained on the signature cards, with the exception of the Tribe's Neighborhood Youth Corps Account (101–035–2), which apparently bore an additional agreement not offered into evidence. This additional agreement apparently precluded the Bank from setting off any Tribal obligations against the Neighborhood Youth Corps account. During the period in question, the Tribe maintained twenty-seven accounts which are relevant to this action. These accounts were (the account titles are followed by their account numbers, in parentheses):

1. *Crow Creek Rehabilitation Program* (101–020–4);

2. *Crow Creek Sioux Tribe General Fund* (101–022–0);

3. *Neighborhood Facilities Account* (101–027–1);

4. *Court Fund* (101–032–8);

5. *Sewer and Roadways* (101–033–6);

6. *Neighborhood Youth Corps* (101–035–2), Project # R8–0049–44;

7. *Planning Grant* (101–038–7), Project # 06–05–15019;

8. *Complex % account* (101–043–3);

9. *Recreation and Commercial Complex* (101–044–1);

10. *Fort Thompson Construction Account—EDA Project # 06 1 008 79—Water Storage Facilities* (101–049–2);

11. *Juvenile Prevention Project* (101–054–9);

12. *Ambulance Service* (101–064–6);

13. *Demoliation* (sic) *Account* (101–065–4);

14. *Dacotah Standard* (101–066–2);

15. *Fort Thompson Water Treatment Plant* (101–067–0);

16. *Headstart Public Careers* (101–073–5);

17. *Home Improvement Fund* (101–074–3);

18. *Community Relations Fund* (101–083–2) *Grant # 2–03–01–803;*

19. *Mutual Help Housing Program* (102–049–8);

20. *Work Experience & Training Project* (102–059–5);

21. *Headstart Office of Child Development* (102–078–1);

22. *Honor Farm* (102–080–3);

23. *Tribal Construction Company* (102–120–6);

24. *Crow Creek Liquor Store* (102–124–9);

25. *E.E.A. Account* (102–128–1);

26. *CAP Program # 80955–G–1–72* (102–141–9), and

27. *Dacotah Trading Post* (110–634–1).

By late April of 1973 the Tribe had undergone a change of its primary governing officers through election. On April 23, 1973, the Tribal Council passed a resolution which stated that, until the Tribe had set up a plan of operations, the new Tribal Chairwoman and Treasurer would be the only persons authorized to draw checks on Tribal checking accounts. Also on April 23, 1973, officers of the bank met with the Tribal Council for the purpose of reviewing the outstanding notes. The bank, through its officers, requested that the Tribal Council execute new notes to renew the outstanding notes. On May 7, 1973, the newly elected Tribal Chairwoman advised the bank that the Council planned no immediate action on this request. The Council wished to defer a decision on the request for notes until an audit of the Tribal financial records could be completed. At this time five of the sixteen notes then outstanding were overdue. These overdue notes were: *EDA Project note* (# 10601); *Planning Grant note* (# 12175); *Council Resolution Renewal note* (# 10610); *The earnest money note* (# 9858); and *First Court Fund note* (# 10611). On May 7, 1973, the Bank sent a letter to the new Tribal Chairwoman advising her that the Bank was freezing Tribal checking accounts and using a setoff procedure to satisfy the outstanding notes. Relevant portions of the letter read as follows:

This is to confirm our telephone conversation of this morning in which I advised you that we were freezing Tribal checking accounts pending further arrangements relative to balances now owed to the Bank.

We very much regret this action which we feel is necessitated by the fact that the present Tribal Council has raised some question as to whether it will honor the obligations with our Bank made by the previous Tribal Council, and has failed to clarify the matter as previously agreed. You will recall that we were advised last week that the Council would meet on Friday, May 4th, and would let us know their position on our notes not

later than close of business that day. You have now advised me as of this morning that no action was taken, that none is planned, and that you are leaving for approximately one week. Further, we understand that funds for which we advanced interim financing have now been diverted elsewhere.

Under the circumstances we have no choice but to deem ourselves insecure, and to declare the entire balances now owed to be due and owing. Accordingly, we are proceeding to satisfy all of same out of the Tribal account balances now on deposit.

The total of all notes, plus accrued interest to date, amount, (sic) to approximately $124,000.00.

We would like to suggest that we are willing to continue to work with the Council, and would be willing to meet with it at any convenient time for the purpose of reaching an understanding in this matter that will permit us to continue as we have in the past. Be assured that we are ready to reinstate these accounts immediately upon receipt of adequate notes properly approved by resolution of the present council.

The Tribal checking accounts were respectively charged for the various outstanding notes as follows:

1. *Crow Creek Rehabilitation Program* (101–020–4)
   a. Case loader payment note (# 11042). Amount charged: $4,858.10;
   b. Case loader note (# 9592) Amount charged: $1,404.54;
   c. Backhoe payment note (# 11041) Amount charged: $2,137.07.

2. *Crow Creek Sioux Tribe General Fund* (101–022–0)
   a. Backhoe payment note (# 11041) Amount charged: $758.60;
   b. Planning Grant note (# 12175) Amount charged: $3,120.96;
   c. Council Resolution Renewal note (# 10610)

Amount charged: $3,696.70;
   d. Second Court Fund note (# 12049) Amount charged: $2,607.03.

3. *Neighborhood Facilities* (101–027–1)
   a. Case loader note (# 9592) Amount charged: $1,081.37;
   b. Water Treatment Plant note (# 12051) Amount charged: $3,245.29.

4. *Court fund* (101–032–8)
   a. First Court fund note (# 10611) Amount charged: $773.58.

5. *Sewer and Roadways* (101–033–6)
   a. Water treatment plant note (# 12051) Amount charged: $1,403.58.

6. *Neighborhood Youth Corps* (101–035–2)
   a. Second Court fund note (# 12049) Amount charged: $157.96;
   b. First Court fund note (# 10611) Amount charged: $2,280.49.

7. *Planning Grant* (101–038–7)
   a. Planning Grant note (# 12175) Amount charged: $910.17.

8. *Complex % Account* (101–043–3)
   a. Insurance Premium note (# 11036) Amount charged: $1,494.88.

9. *Recreation and Commercial Complex* (101–044–1)
   a. Motel note (# 12050) Amount charged: $3,381.28.

10. *Fort Thompson Construction Account—Water Storage Facilities* (101–049–2)
    a. Water treatment plant note (# 12051) Amount charged: $351.74.

11. *Juvenile Prevention Project* (101–054–9)
    a. First Court Fund note (# 10611) Amount charged: $540.43.

12. *Ambulance Service* (101–064–6)
    a. EDA Project note (# 10601)

Amount charged: $348.50.

13. *Demolition Account* (101–064–4)

a. Backhoe payment note ( # 11041)

Amount charged: $1,288.07.

14. *Dacotah Standard* (101–066–2)

a. Dacotah Standard note ( # 12052)

Amount charged: $304.73.

15. *Fort Thompson Water Treatment Plant* (101–067–0)

a. Water treatment plant note ( # 12051)

Amount charged: $3,104.30.

16. *Headstart Public Careers* (101–073–5)

a. EDA Project note ( # 10601)

Amount charged: $8,500.39;

b. Second Court Fund note ( # 12049)

Amount charged: $559.41.

17. *Home Improvement Fund* (101–074–3)

a. Backhoe payment note ( # 11041)

Amount charged: $718.83

18. *Community Relations Fund* (101–083–2)

a. First Court Fund note ( # 10611)

Amount charged: $2,614.25.

19. *Mutual Help Housing Program* (102–049–8)

a. Case loader note ( # 9592)

Amount charged: $1,421.87.

20. *Work Experience & Training Project* (102–059–5)

a. Backhoe payment note ( # 11041)

Amount charged: $326.63;

b. Backhoe and front-end loader note ( # 8738)

Amount charged: $8,141.39.

21. *Headstart Office of Child Development* (102–078–1)

a. Second Court Fund note ( # 12049)

Amount charged: $2,076.37.

22. *Honor Farm* (102–080–3)

a. Second Court fund note ( # 12049)

Amount charged: $1,874.74;

b. Tractor note ( # 8036)

Amount charged: $2,458.09.

23. *Tribal Construction Company* (102–120–6)

a. Case loader note ( # 9592)

Amount charged: $3,424.60.

24. *Crow Creek Liquor Store* (102–124–9)

a. EDA Project note ( # 10601)

Amount charged: $5,168.17;

b. Dacotah Standard note ( # 12052)

Amount charged: $5,267.02;

c. Insurance premium note ( # 11036)

Amount charged: $7,493.76;·

d. Motel note ( # 12050)

Amount charged: $4,217.10.

25. *E.E.A. Account* (102–128–1)

a. Second Court Fund note ( # 12049)

Amount charged: $789.40.

26. *CAP Program* (102–141–9)

a. EDA Project note ( # 10601)

Amount charged: $15,757.90.

27. *Dacotah Trading Post* (110–634–1)

a. EDA Project note ( # 10601)

Amount charged: $2,309.58;

b. The earnest money note ( # 9858)

Amount charged: $115.32.

The Complaint alleges that thirteen notes were made by the Tribal Chairman without authority, that the Bank knew that the Chairman was lacking in authority, that the Secretary of the Interior did not approve the thirteen notes, and that therefore the notes are in violation of 25 U.S.C. §§ 81 and 85. The Complaint also alleges that the Tribe's refusal to renew the notes upon the change in government was based on the Bank's failure to provide proof of the legality and propriety of the notes. It is also alleged that the Bank acted improperly in setting off the loan obligations against Tribal checking accounts, that as a result Tribal checks were returned for insufficient funds, thus damaging the Tribe's commercial and financial reputation. The Complaint sought injunctive relief against further dishonoring Tribal checks, damages of

$124,000.00 and declaratory relief under 25 U.S.C. §§ 81, 85 and 28 U.S.C. §§ 2201, 2202.

The amended answer purported to admit subject matter and personal jurisdiction, and alleged that all of the notes in question had been either expressly or impliedly authorized by the conduct of the Tribal government. The answer also alleged that the set-offs were done after the bank had deemed itself insecure pursuant to the depository agreement. The answer also set up a counterclaim alleging that, in the event Plaintiff were to receive a restoration of the funds in its various accounts, then Defendant is entitled to a judgment equalling the amount of the Tribe's indebtedness to the Bank as of May 7, 1973.

Although the Complaint has not been amended, the Tribe's Memorandum Brief filed subsequent to trial indicates that the Tribe has abandoned its federal claims under 25 U.S.C. § 81, relating to the alleged lack of the Tribal Chairman's authority to execute the notes and the alleged lack of approval of the loans by the Secretary of the Interior.

In light of this, the issues now before this Court have narrowed to whether the Bank had the right under these circumstances to deem itself insecure and set-off the notes against the Tribal accounts. Thus the action as it now stands is essentially a claim under S.D.C.L. § 57–21–3 for wrongful dishonor by a payor bank of its customer's checks.

JURISDICTION

■ The Complaint alleged that this Court's jurisdiction over the subject matter of this action exists pursuant to 28 U.S.C. §§ 1331, 1337, 1343, 1353 and 1362; 25 U.S.C. § 81 and 15 U.S.C. § 1681. This Court begins its examination of the jurisdiction question by looking to 28 U.S.C. §§ 1331 and 1362. For purposes of this action, these two sections are practically synonymous, but § 1362 seems more appropriate in view of the fact that it expressly applies to an Indian tribe's right to bring suit to enforce its federally protected rights. *cf. Standing Rock Sioux Indian Tribe v. Dorgan,* 505 F.2d 1135, 1140 (8th Cir. 1974). This Court finds that jurisdiction exists under 28 U.S.C. § 1362 to determine the federal questions arising under 25 U.S.C. § 81. Further, this Court exercises its discretion to assume pendent jurisdiction over the state law claims of wrongful set-off and wrongful dishonor under S.D.C.L. § 57–21–3, despite the fact that the Tribe has apparently abandoned its federal claims. Several considerations underly this Court's discretionary assumption of pendent jurisdiction in this case. First, it should be noted that, in the judgment of this Court, the federal and state claims derive as a practical matter from a common nucleus of operative fact in that all of the claims concern whether and to what degree the Bank may enforce the loan agreements. Further, the Tribe's claims are such that the Tribe would be expected to join them all in one lawsuit. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Thus this Court has the power to assume jurisdiction over the state claims. This Court chooses to exercise that jurisdiction after weighing the amount of judicial time and energy invested, the difficulty of the state claim and the amount of additional time and energy needed to resolve the state claims. *See Kuhn v. National Association of Letter Carriers,* 528 F.2d 767, 771 n. 6 (8th Cir. 1976). *See also Farmland Industries Inc. v. Kansas-Nebraska Natural Gas Company, Inc.,* 486 F.2d 315, 318 n. 1 (8th Cir. 1973). Central to this Court's consideration is the fact that the Tribe did not abandon its federal claims until after both the federal and state claims had been tried together, and thus a comparatively substantial amount of judicial time and energy had been invested in the entire lawsuit. *Forest Laboratories, Inc. v. Pillsbury,* 452 F.2d 621, 629 (7th Cir. 1971). Finally, the degree to which the state claims would be triable and enforceable in a South Dakota State Court is not entirely beyond question. *See Smith v. Temple,* 82 S.D. 650, 152 N.W.2d 547 (1967). *See also Annis v. Dewey County Bank,* 335 F.Supp. 133 (D.S.D.1974).

In summary, this Court finds that 28 U.S.C. § 1362 and the discretionary exercise of existing pendent jurisdiction provide the jurisdictional predicate necessary to proceed to the merits of the parties' basic claims.

## THE MERITS *

### A. *The Matured Obligations*

■ As noted above at page 863, this Court finds that five of the sixteen notes outstanding on May 7, 1973, had matured through expiration of the due dates appearing on the face of the notes. These matured or overdue notes were: *EDA Project note* ( # 10601); *Planning Grant note* ( # 12175); *Council Resolution Renewal note* ( # 10610); *The earnest money note* ( # 9858); and *First Court Fund note* ( # 10611). As to the obligations underlying these notes, this Court concludes for reasons set out below that the Bank properly exercised its right of set-off against demand deposits which were general in nature.

■ In the case of *Calmenson Clothing Co. v. First National Bank and Trust Co.,* 63 S.D. 338, 258 N.W. 555 (1935), the South Dakota Supreme Court stated:

> A bank to which a depositor owes a matured debt may set off or apply his general deposit to the discharge of such debt, and this right, at least with respect to a matured indebtedness, is not dependent upon the consent of the depositor. 63 S.D. at 341, 258 N.W. at 557.

The above-quoted statement of South Dakota law is in line with the generally-accepted rule of law concerning the right of a bank to set off general deposits against matured obligations. *See Jensen v. State Bank of Allison,* 518 F.2d 1, 5 (8th Cir. 1975); 9 C.J.S. *Banks and Banking* § 296 (1938); 10 Am.Jur.2d *Banks* §§ 666–70 (1963). *cf.* S.D.C.L. § 44–11–11. This right of set-off is part of the bundle of rights and obligations inherent in the debtor-creditor relationship normally established when a deposit is made in a bank.

In short, the Bank had the right to set-off with respect to the five matured notes. The next question is whether the accounts which the Bank charged in exercising its right of set-off were general or special accounts. The accounts were: *Headstart Public Careers* (101–073–5); *Dakotah Trading Post* (110–634–1); *Ambulance Service* (101–064–6); *CAP Program* (102–141–9); *Crow Creek Liquor Store* (102–124–9); *Planning Grant* (101–038–7); *General Fund* (101–022–0); *Court Fund* (101–032–8); *Juvenile Prevention Project* (101–054–9); *Community Relations* (101–083–2); and *Neighborhood Youth Corps* (101–035–2). (The *Neighborhood Youth Corps* account was subsequently refunded after the Bank discovered an agreement, not offered into evidence, whereby the Bank had waived its right of set-off with respect to that account.) The total amount set off to satisfy the five matured notes was $46,136.64.

■ South Dakota law requires an agreement, express or implied, between the bank and the depositor in order to classify an account as special and thus not subject to set-off. *Calmenson Clothing Co. v. First National Bank & Trust Co.,* 63 S.D. 338, 258 N.W. 555 (1935). The agreement may be manifested by the bank's acceptance of a conditional deposit. *Peterson v. Crawley,* 38 S.D. 597, 162 N.W. 369 (1917). Absent an agreement, whether express or implied from the circumstances, mere knowledge on the part of the bank that the depositor has a particular purpose in mind for the account in question is alone insufficient to warrant the conclusion that the account is special. *Calmenson Clothing Co., supra,* 63 S.D. at 342, 258 N.W. at 557 (1935). *Commercial National Bank of Sturgis v. Smith,* 60 S.D. 376, 244 N.W. 521 (1932). Again, the rule in South Dakota appears to be in line with the generally accepted rule. *In re Goodson Steel Corporation,* 488 F.2d 776, 778–779 (5th Cir. 1974); *First National Bank of Clinton v. Julian,* 383 F.2d 329, 337 (8th Cir. 1967).

---

* At the outset, this Court wishes to stress that it did not, in the course of reaching its decision, consider as evidence an affidavit filed by Plaintiff subsequent to the trial of this action.

▓▓▓ . One generally recognized exception to the rule requiring an agreement for an account to be considered special arises where the bank has knowledge that a third party has an interest in the funds deposited in the account in question. *See Universal C. I. T. Credit Corporation v. Farmers Bank of Portageville,* 358 F.Supp. 317 (E.D.Mo. 1973); *Peterson v. Crawley,* 38 S.D. 597, 162 N.W. 369 (1917). This situation, involving interests or claims of third persons, must be distinguished from that where the depositor has a special *purpose* in mind for the funds and thus wishes to maintain a separate account for accounting purposes. Where a third person has a claim in funds held by a bank, or where the funds are deposited as security for the claims of a third person, the bank's knowledge of the arrangement alters, to the extent of the claim or security, the debtor-creditor relationship normally existing between the bank and its depositor. *United States v. Butterworth-Judson Corporation,* 267 U.S. 387, 395, 45 S.Ct. 338, 340, 69 L.Ed. 672 (1925).

▓▓▓ In this case, the Tribe was required by government restrictions and regulations to periodically account for the respective federal grants it had received. No evidence was presented, however, to indicate that these accounting restrictions reach the status of a claim, security or similar interest of the federal government in the funds deposited in the Tribal accounts. One of the methods the Tribe used for this accounting was the segregation of the grant monies into various checking accounts according to the particular grant involved. While the Bank may be charged with knowledge that, for accounting purposes, various separate accounts were maintained for each of the various tribal programs, there is no evidence to indicate that the Bank had agreed that any special conditions attach to its rights with respect to the deposits. *cf.* S.D.C.L. § 57–19–38. *Ribaudo v. Citizens National Bank of Orlando,* 261 F.2d 929, 933 (5th Cir. 1958). Except for the later refunded Neighborhood Youth Corps Account, there is no evidence to indicate that, with respect to the accounts involved in the set-off of matured

obligations, there was any agreement other than the signature card agreement set out about at pages six and seven. The fact that the Neighborhood Youth Corps Account apparently had an agreement precluding set-off supports the conclusion that similar special deposit agreements could have been made, or at least that the parties were aware of the need for such agreements in ordinary circumstances. In the absence of such an agreement, and in the absence of evidence showing any knowledge on the part of the Bank that the funds deposited in the accounts were subject to or security for any claims of third persons, this Court can only conclude that the accounts in question here, with the exception of the Neighborhood Youth Corps account, were general in nature, and thus subject to the Bank's right to set-off the accounts in satisfaction of matured obligations. The two cases relied on by the Tribe, *United States v. Butterworth-Judson Corporation,* 267 U.S. 387, 45 S.Ct. 338, 69 L.Ed. 672 (1925) and *Kaufman v. First National Bank of Opp, Alabama,* 493 F.2d 1070 (5th Cir. 1974) do not compel a contrary conclusion. In *Butterworth-Judson,* the bank had knowledge that the deposit in question was held for the use of, and subject to the secured claim of the United States, thus altering the debtor-creditor relationship between bank and the depositor. In *Kaufman,* the bank took an active, supervisory role in ensuring that the deposits in question were properly used in fulfilling a special purpose involving third parties' interests.

▓▓▓ The final issue raised by the Bank's set-off for the overdue notes is whether the Bank should be required to first exhaust the collateral which secured some of the notes. First, it should be noted that the Bank would encounter some difficulty enforcing its right to the collateral. *Annis v. Dewey County Bank,* 335 F.Supp. 133 (D. S.D.1974). Second, although no South Dakota law could be found on this point, the general rule does not require that banks exhaust collateral before exercising their right to set-off deposits to satisfy matured obligations. *See discussion and collection of*

*authorities in Jensen v. State Bank of Allison,* 518 F.2d 1 at 6 (8th Cir. 1975). Under the circumstances of this case, with the questionable ability of the Bank to enforce its secured creditor status against Tribal property, this Court concludes that the Bank acted properly in choosing not to first exhaust its collateral before exercising its right of set-off as to the over due notes.

### B. *The Unmatured Obligations*

As set out above, the Bank had an inherent right to satisfy the overdue notes by setting off against the Tribe's demand deposits. With respect to the notes not yet due as of May 7, 1973, however, a different question is presented. As stated above, at page 6, one of the original sixteen notes was merely a renewal of a prior note. Five notes were overdue on May 7, 1973. Thus, ten notes were outstanding but not yet due on May 7, 1973. These notes were: *Case loader note; Case loader payment note; Backhoe and front end loader note; Backhoe payment note; Water treatment plant note; Dacotah Standard note; Insurance premium note; Motel note; Tractor note;* and *Second Court Fund note.* A total of $66,387.75 was set off against numerous Tribal accounts to satisfy these notes. This Court concludes, for reasons set out below, that the Bank had no right of set-off as to these unmatured obligations.

The general rule is that a bank, in the absence of express authority, may not set off the unmatured obligations of a depositor against the depositor's account, whether that account is general or special. 10 Am.Jur.2d *Banks* § 669 (1963). *See Aetna Casualty and Surety Company v. Atlantic National Bank of Palm Beach,* 430 F.2d 574, 577 (5th Cir. 1970). Research has disclosed that, in each case where Courts have upheld a set-off to satisfy unmatured obligations, there was an express agreement allowing the bank to deem itself insecure and set-off the obligations. *e. g. Jensen v. State Bank of Allison,* 518 F.2d 1, 5 (8th Cir. 1975); *Farmers Co-op Elevator, Inc. v. State Bank,* 236 N.W.2d 674, 677 (Iowa S.Ct.1975). Although no South Dakota law

could be found on this particular point, the South Dakota Supreme Court has indicated that it recognizes a need for an agreement authorizing set-off of unmatured obligations. In *Calmenson Clothing Co. v. First National Bank & Trust Co.,* 63 S.D. 338, 258 N.W. 555 (1935), it was said that the right of a bank to set-off,

" . . . at least with respect to a matured indebtedness, is not dependent upon the consent of the depositor." 63 S.D. at 341, 258 N.W. at 557.

Agreements authorizing set-off against unmatured obligations commonly take the form of "acceleration clauses," or clauses which authorize the bank to declare an obligation to be payable in advance of its due date whenever the bank deems itself insecure. S.D.C.L. § 57–1–24, in referring to such agreements, sets out as examples an option to accelerate payment "at will" and "when he deems himself insecure."

As noted above at page 860, each of the notes contained a clause which allowed the Bank to accelerate upon "any default in the payment of interest." There was no evidence to indicate that there had been a default in interest payments by May 7, 1973. The Bank does not contend that the Tribe was insolvent on May 7, 1973. *cf.* 9 C.J.S. *Banks and Banking* § 298 (1938). Each note also stated that it was "payable at a definite time subject to any acceleration." None of the notes expressly authorized the Bank to accelerate at will or whenever it deemed itself insecure. No evidence of any other agreements concerning the loans was offered, nor was there any evidence relating to the parties' interpretation of the terms relating to acceleration. With respect to the Bank's ability to accelerate at will, the loan agreements offered in evidence are ambiguous at best. In construing the loan agreement, the Court notes that it was a form contract, executed on a form provided by the Bank. South Dakota law requires that ambiguities in a form contract be construed most strongly in favor of the party who prepared and provided the form. *Jones v. American Oil Co.,* 87 S.D. 384, 389, 209 N.W.2d 1, 4

(1973). Under these circumstances, this Court can only conclude that the Bank had no right to set-off Tribal accounts against the ten unmatured notes. Therefore, this Court will Order that the accounts in question be restored in an amount equal to the set-offs in satisfaction of the notes which were not yet due on May 7, 1973.

## DAMAGES

■ Although the Complaint alleged that the Tribe suffered injury to its commercial and financial reputation, and Plaintiff's post-trial brief refers to damages flowing from the Tribe's inability to account for grant monies because of the set-off, no evidence was offered from which this Court could infer that any compensable damages were sustained by the Tribe. Plaintiff has requested that this Court set another trial date on the issue of damages. Treating this request as a motion for separation of issues under Federal Rules of Civil Procedure 42(b), the request is hereby denied as untimely. *See Davis v. Yellow Cab Company*, 220 F.2d 790, 791 (5th Cir. 1955).

## THE COUNTERCLAIM

As noted above at page 866, the Bank has counterclaimed, seeking judgment in an amount equal to any amount which this Court orders restored to the Tribal checking accounts. Because of this Court's findings and conclusions with respect to the set-offs, the counterclaim now concerns only the ten notes which had not yet matured on May 7, 1973.

■ Each of these ten notes was executed by the Tribal Chairman who was serving at the time the loan agreements were made. The due date on each of the ten notes had expired prior to the trial of this action. In its Memorandum Brief filed subsequent to trial, the Tribe admits that it received benefits from the loans made by the Bank, and eschews any contention that the loans were illegal. Thus any effort by the Tribe to resurrect its now-abandoned claims under 25 U.S.C. § 81 as a defense to the counterclaim would be futile in that the Tribe would be estopped from asserting

such a defense, even if available. Accordingly, this Court finds for the Bank on its counterclaim to the extent of the amounts due on the ten notes which were unmatured on May 7, 1973.

This Court is aware, however, that the result of its decision in this case seems to give the Bank the opportunity to set off the accounts which are to be restored against the now matured ten outstanding notes involved in the counterclaim. Accordingly, it will be Ordered that the parties make reasonable accommodations so that, while the Bank will ultimately receive repayment of its loans, the Tribe's ability to account for the grant monies in the checking accounts will not be impaired by further set-off.

The foregoing shall constitute this Court's findings of fact and conclusions of law.