JOHN R. BROWN, Circuit Judge:
This case, Multiponics II, involves another part of the Multiponics bankruptcy reorganization, elaborately depicted in Multiponics L[1] Here we face an attempted setoff by a *727 bank of funds belonging to Multiponics, the bankrupt debtor. We hold that the setoff was improper and affirm the District Court’s order directing the bank to turn over the funds to the bankruptcy trustee.

Setup For Setoff

On February 19, 1970 Lehman Commercial Paper, Inc. (Lehman) loaned Multiponics (then called Ivanhoe Associates) $4,500,-000 in exchange for Multiponic’s interest-bearing promissory note. Lehman gave Multiponics a check for the $4,500,000 which Multiponics endorsed over to Citibank (then called First National City Bank). Citibank then issued an irrevocable letter of credit in favor of Lehman for the $4,500,000. In addition, as security for the letter of credit, Citibank and Multiponics entered into a letter agreement whereby the $4,500,000 was placed in a non-interest-bearing bank account.
To cover the first year’s interest payments on the promissory note, Citibank issued a second irrevocable letter of credit in the amount of $440,562.50 in favor of Lehman. The interest payments were due quarterly, with the final payment of $106,-625 due on March 1, 1979. In addition, Citibank and Multiponics entered into a second letter agreement whereby $440,-562.50, the total amount of interest payments, was placed in a second non-interest-bearing account at Citibank.[2] In that agreement, Multiponics gave Citibank the authority to charge the account by the amount of the interest payment. Multiponics also agreed that it would make no withdrawals unless Citibank agreed to them.[3]
On February 8, 1971, approximately one year later, and three weeks before the final payment of interest on the promissory note was due, Multiponics filed its Chapter X petition for reorganization. On February 11, the District Court issued an order to stay creditors from interference with the possession or maintenance of Multiponics’ assets. On February 16, in accordance with the first letter of credit, Citibank paid the principal due Lehman on the $4,500,000 Multiponics promissory note. However, under the second letter of credit, Citibank was still required to forward to Lehman the full sum of $106,875, which included the March I payment of $16,625. Lehman and Citibank then reached an “understanding” whereby Lehman returned the $16,625 interest overpayment. However, the overpayment was returned not to the trustee but to Citibank. On March 1, upon receipt of the interest overpayment, Citibank set off the $16,625 against a larger indebtedness of Multiponics to the bank.
On August 25, 1971 the trustee filed an application for a turnover order to compel the return by Citibank of the setoff funds. The District Court ordered the turnover. In re Multiponics Inc., 436 F.Supp. 1072 (E.D.La.1977).

Discrediting The Creditor

Section 68a of the Bankruptcy Act, II U.S.C.A. § 108, provides that a bankrupt and creditor may set off all mutual debts and credits:
In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid.
Clearly, for this right of setoff to apply, there must be mutuality of obligation between debtor and creditor, a true debtor-creditor relationship. See generally 4 Collier On Bankruptcy 168.04 (14th ed. 1978). Here there is no question that Multiponics *728 was the debtor of Citibank due to a prior obligation. The only question is whether Citibank was the debtor of Multiponics by virtue of the second bank account.
Generally, where funds are on deposit at a bank, a presumption of a debtor-creditor relationship arises . Republic National Bank of Houston v. Sheinfeld (In re Goodson Steel Corp.), 488 F.2d 776, 779 (5th Cir. 1974). “As a general rule, in the absence of an agreement to the contrary, a deposit, not made specifically applicable to some other purpose, may be applied by the bank in payment of the indebtedness of the depositor.” United States v. Butterworth-Judson Corp., 267 U.S. 387, 394-95, 45 S.Ct. 338, 340, 69 L.Ed. 672, 677 (1925) (citing authority).
Nonetheless, this presumption is rebutted and mutuality negated when the funds on deposit with the bank are held in a special account or impressed with a trust. Id.; Ribaudo v. Citizens National Bank of Orlando, 261 F.2d 929, 933 (5th Cir. 1958); New Jersey National Bank v. Gutterman (In re Applied Logic Corp.), 576 F.2d 952, 958 (2d Cir. 1978). As we explained in Goodson :
When money or its equivalent is deposited in a bank without any special agreement, the law implies that it is to be mingled with the other funds of the bank, the relation of debtor and creditor is created between the bank and the depositor, and the deposit is general. In such a transaction the bank becomes the owner of the fund.
488 F.2d at 779 (quoting authority). By contrast,
When, on the other hand, money or its equivalent is so deposited with an accompanying agreement that the identical thing deposited shall be returned, or that the same shall be paid out for a specific purpose, the relation thus created is not that of debtor and creditor. Such a transaction is a special deposit, and the bank is liable only as a bailee. In such a case the fund is a trust fund, the bank acquires no title thereto, and is a mere trustee for the safekeeping, return, or disbursement of the fund, according to the special contract by which the deposit is made.
Id. (quoting authority).
Close examination of these general principles reveals some fuzziness and overlap in the analysis and terminology regarding the right of setoff. Kaufman v. First National Bank of Opp, Alabama, 493 F.2d 1070, 1071 (5th Cir. 1974). Some Courts look to the law of trusts, requiring an understanding that the funds be kept separate from the rest of the bank’s funds to preclude a set-off. E. g., First National Bank of Clinton v. Julian, 383 F.2d 329 (8th Cir. 1967); Kaufman v. First National Bank of Opp, Alabama, 493 F.2d at 1072; In re Goodson Steel Corp., supra; Restatement (Second) of Trusts § 324, Comment i (1959). Other Courts ask whether a special deposit has •been created, with a special purpose known to the parties involved, rather than a general fund. E. g., In re Goodson Steel Corp., supra; Ribaudo v. Citizens National Bank of Orlando, supra. See also In re Applied Logic Corp., supra. Still others use the terminology interchangeably. See Kaufman v. First National Bank of Opp, Alabama, 493 F.2d at 1072.[4] The difficulty of characterization of an account is further complicated by the general rule that a federal court must look “with an interested eye” to state law. In re Goodson Steel Corp., 488 F.2d at 779.
In this case, regardless of whether we characterize this account as a trust or a special account, it is clear that the presumption of a debtor-creditor relationship was rebutted. Here, the second account was established solely to secure the payment by Citibank under the second letter of credit. The entire arrangement suggests an under- *729 standing between Multiponics and the Bank that something other than an ordinary deposit was effected.
Citibank vigorously asserts that First National Bank of Clinton v. Julian, 383 F.2d 329 (8th Cir. 1967) controls this case, requiring that a setoff be allowed. In Julian, the bankrupt, an automobile dealer, had a floor plan mortgage and other financial arrangements with the bank. According to the bank, a “Reserve account” was established to provide additional security for the bank on the bankrupt’s actual and contingent indebtedness. The Eighth Circuit accepted the bank’s explanation for the account, observed that the bankrupt could not withdraw funds from the account without the bank’s permission, and pointed out that the bank did not and need not separate the reserve account from its other funds. On these bases, the Court held that the account was merely a general deposit for a special purpose and allowed the bank to set off the funds.
In our case, as in Julian, the account in question was established as security, to ensure the payment by Citibank under the letter of credit. And, like Julian, Multiponics could not withdraw funds without Citibank’s permission. Unlike Julian, however, Citibank at all times segregated the funds from the rest of its accounts. One of Citibank’s own officers explained this segregation:
Q. Tell me what happened then in the first quarter of 1971, if anything, with reference to that time deposit?
A. We honored our commitment and we made the final payment.
Q. From that particular account?
A. That’s correct.
Q. How was it done, mechanically on the bank’s books?
A. I’m not sure I can tell you the internal bookkeeping on this. Let me just think. We charged the account for the remaining dollars in that account, which were exactly comparable to the amount required for the final payment, and issued a cashier’s check to Lehman and delivered it to Lehman.
Deposition, Guy W. Byrd, then Assistant Vice-President of Citibank, June 16, 1962 (emphasis added). And the funds were in fact used by Citibank as intended — solely to satisfy the interest payments under the letter of credit.
Also, in our case, the nature of the agreement differs from that in Julian. In Julian, the Court relied on testimony presented by the bank coupled with a notation on the account ledger (that withdrawal of the funds required approval of a certain bank officer) to show that the account was not a special one. In our case, however, an express agreement suggested that the account was not a routine debtor-creditor account, but required special arrangements. And, the depositor’s access to the funds held by the bank was expressly restricted. The second letter agreement specifically directed that unless permission was given by Citibank, Multiponics had no right to withdraw any of the funds so long as the first letter of credit was outstanding. While this factor alone might be insufficient to preclude a setoff, see First National Bank of Clinton v. Julian, supra, combined with the other facts here, we cannot ignore its import.
Moreover, Julian involved only bankrupt and bank, whereas our case involves a third party, Lehman, as well. This three party structure is more suggestive of a trust-like relationship than the two party one in Julian. Cf. 89 C.J.S. Trusts § 50d (1955). Finally, Julian was a decision by the Eighth Circuit relying on Missouri law, not federal law. In any event, to the extent that the reasoning in Julian may leave open the possibility for a contrary result here, we decline to follow it.
Further, the very language of the agreement was consistent with the special purpose of the account, known to the bank. The second letter agreement stated:
In consideration of your Bank issuing its undertaking [the letter of credit] . ., we agree that you may charge the amount of the payment under that Undertaking to that account on or shortly before the date that each such payment is to be made.
*730 Citibank contends that the choice of the word “may” is only permissive so that Citibank, in fact, had complete control over whether or not it would charge the account. This construction lifts the word out of context. Here, Multiponics gave Citibank the right to charge Multiponics’ account in exchange for Citibank’s issuance of the letter of credit. Only when the interest payments were due, would Citibank debit Multiponics’ account. Also, while the language is loosely drafted — which is understandable since the agreement was in letter rather than more elaborate contract form — it may be characterized as language of consideration, suggesting a conditional promise, see J. Calamari and J. Perillo, The Law of Contracts § 71 (1970), or a set of concurrent conditions. Id. § 139. Moreover, the single grant of authority to Citibank underscores not the permissive nature of the account, but its very limitation. Citibank was given the authority to charge Multiponics’ account, but to do no more than that. Such a uni-purpose account, under which the bank is strictly controlled in its use of the funds, may be just the kind of special account for which setoff is inappropriate.
The applicable state law does not change our analysis. Citibank roves its “interested eye” to the law of New York, specifically to the case of Ehag Eisenbahnwerte Holding Aktiengesellschaft v. Banca Nationala A Romaniei, 306 N.Y. 242, 250, 117 N.E.2d 346, 350 (1954). In that case there appeared to be an agreement between the depositor and the bank denominating the deposits as a special account for a specific purpose, yet the Court refused to find a trust relationship between the parties. That case involved the failure to state a cause of action for damages rather than a bankruptcy matter. More importantly, the Court ruled that control of the funds was at all relevant times retained by the depositor. This clearly distinguishes that case from ours and returns our interest, and our attention to federal law.
Most importantly, technical legal arguments aside, the setoff on its face was suspect. Deposits procured for the purpose of effecting a setoff destroy the right of setoff and .are considered voidable preferential transfers. Herzog v. Mandan Security Bank (In re PRS Products, Inc.), 574 F.2d 414, 417-18 (8th Cir. 1978); 4 Collier On Bankruptcy ¶ 68.16[2.1], at 923 — 26 (14th ed. 1978). Here, the District Court, after a careful review of the facts, was suspicious of the purpose of Lehman’s return of the $16,625 directly to Citibank.[5] Since the turnover order was already in effect, the more appropriate action would have been to turn over the funds to the trustee. We concur in the District Court’s conclusion that the arrangement between Lehman and Citibank was characterized by less than good faith.
We refuse to permit the possibility of a setup for a setoff.
AFFIRMED.

. See Multiponics I, 622 F.2d 709 (5th Cir. 1980) [1980, at 711-712] and Multiponics III, 622 F.2d 731 (5th Cir. 1980) [1980, at 732],

. Apparently, it had been arranged that Multiponics would present Citibank with acceptable substitute collateral on the following day. When Multiponics did so, Citibank released $1,300,000 from Multiponics’ first bank account using $440,562.50 to fund the second account.

. As to the rationale for this three party arrangement — replete with twin letters of credit and twin bank accounts — neither the briefs stated — nor could counsel at oral argument upon questioning provide — an explanation. To us, the reason for the choice of such an unduly complicated structure of transactions, remains an enigma.

. The Court quoted the following language from 4 Collier on Bankruptcy fl68.16[2.1] at 926 (14th ed. 1978): “where the deposit is made for a special purpose, known to the bank —as, for example, to be paid to creditors — the money is held as a trust fund and hence the bank is without lawful right to appropriate the deposit to its own use as a set-off.” (Footnote omitted).

. The following colloquy is illuminating:
THE COURT: I suggest to you that Citibank had no right to enter in that agreement ■with [Lehman] and [Lehman] had no right to enter into that agreement with Citibank, and I think that it was a “scratch my back and I’ll scratch your back-type transaction.”
MR. SALASSI: Your Honor, I would suggest to the Court that the transaction had to be handled in some fashion.
THE COURT: No, it didn’t. It could have been properly handled by sending that money to the Trustee; and the sole purpose of handling it that way, I suggest, was to enable Citibank to get possession of the funds in order to make the claim it now makes.
MR. SALASSI: Well, Your Honor, obviously we disagree on the—
THE COURT: Well, that’s the factual inference I draw from the testimony, and I have read carefully the depositions. That’s really what I deduce, and I suggest to you under that state of facts, you are correct; this is not a waiver case. This is a case where Citibank improperly came into possession of funds that were the Trustee’s funds, and it had no right of setoff against those funds.
MR. SALASSI: Your Honor, we respectfully disagree.